**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**COMMONWEALTH CHEMICAL SECU-RITIES, INC., et al., Defendants.**

**No. 74 Civ. 1984–LFM.**

United States District Court,
S. D. New York.

March 30, 1976.

William D. Moran, Regional Administrator, S. E. C., New York City, for plaintiff; Franklin D. Ormsten, Charles B. Pearlman, Martin S. Cohen, Robert J. Benowitz, New York City, of counsel.

Schwenke & Devine, New York City, for defendants; Michael C. Devine,

David M. Butowsky, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

The complaint in this action rambles for some thirty-four pages and alleges violations of ten statutes and six rules of the Securities and Exchange Commission ("SEC") by fifteen defendants. The presentation of the case upon the trial was confused, disjointed, unfocused, incoherent and, at times, incomprehensible. Nor were the post-trial briefs of any assistance whatever in marshalling the evidence and relating it to the legal contentions of the parties. This has placed an intolerable burden upon the limited time and resources of a busy trial judge in this congested district.

Criminal cases under the securities laws and mail fraud statutes, involving equally complex transactions, are routinely tried and disposed of in this court in a fraction of the effort and time devoted to this poorly presented case. Here, we have been put to the almost endless and certainly exhausting task of trying to bring order out of chaos. Nonetheless, we must deal with the issues of fact in light of the applicable law as best we can perceive them under the circumstances.

Essentially, defendants are charged with fraud in connection with a "best efforts, 50,000 units or none" public offering of 100,000 units of securities of Beneficial Labs, Inc. ("Beneficial") and with manipulation of trading in Beneficial securities with a design to inflate their price artificially and unload them on unsuspecting public investors.

The SEC seeks judgment permanently enjoining defendants from future violations and ancillary relief in the form of disgorgement of profits. A preliminary injunction was granted on May 28, 1974 following a hearing, and a plenary trial to the court was held on March 17, April 30, May 1 and May 2, 1975.

## THE PARTIES

Only seven defendants now remain:[1]

(1) Commonwealth Chemical Securities, Inc. ("Commonwealth"), a registered broker-dealer located in New York City, which, as underwriter, commenced a "best efforts, 50,000 units or none" public offering of 100,000 units of Beneficial securities on December 20, 1971.

(2) Robert Drucker ("Drucker"), vice-president and a director of Commonwealth, who, at the time of the alleged violations, was an officer and director of Vanguard Fund, Inc. ("Vanguard Fund") and of New York Hedge Fund, Inc. ("Hedge Fund"), formerly known as the Berkeley Dean Special Fund, Inc. Drucker was also president and a director of DK & B Management, Inc. (DK & B") from 1971 through 1974.

(3) Julius Kleinman ("Kleinman"), president, treasurer and chairman of the board of directors of Commonwealth, who, at the time of the alleged violations, was an officer and director of the Hedge and Vanguard Funds. Kleinman was also vice-president, secretary and a director of DK & B.

(4) DK & B, the registered investment advisor to the Hedge Fund from October 24, 1972 to September 22, 1973 and to the Vanguard Fund from March 22, 1972 to July 16, 1973. Drucker and Kleinman are the principal officers and directors of DK & B.

(5) Mary Sharpe ("Sharpe"), Commonwealth's bookkeeper from August 1970 to June 1974.

(6) Zoltan Guttman, a/k/a Lou Goodman ("Guttman"), cashier and registered

---

1. Consent judgments were entered against the following defendants on the dates indicated: Gerald Wolff (12/3/74); Michael Rekoon (12/18/74); Vincent Caccese (3/21/75); Darold Myles Shirwo (5/2/75); Cabot Shaw, Inc. (5/8/75); John Feldman (5/23/75); and Beneficial Labs, Inc. (5/23/75). This action was dismissed with prejudice as against defendant Dorothy Drucker on June 18, 1975.

representative of Commonwealth from November 1970 to December 1973.

(7) Marlane Kleinman, a/k/a Marcia Klein ("Marlane Kleinman"), Kleinman's wife and a stockholder of Beneficial.

## THE CLAIMS

Essentially, the SEC asserts two claims:

First, it is alleged that certain defendants participated in a fraudulent offering of Beneficial securities. As mentioned above, Commonwealth, as underwriter, commenced a "best efforts, 50,-000 units or none" public offering of 100,000 units of Beneficial securities on December 20, 1971. The offering represented that if 50,000 units were not sold by its termination date (not later than March 19, 1972) "all funds from subscribers will be refunded in full without interest." The SEC asserts that there was a short fall in the sale of the units and that defendants Commonwealth, Drucker, Kleinman, Sharpe and Guttman camouflaged the failure to sell the 50,000 minimum number by placing several thousand units in nominee accounts and by causing a closing to be held on March 10, 1972.

Second, the SEC claims that all defendants participated in a fraudulent scheme to raise the price of Beneficial securities artificially by manipulating trading after the March 10, 1972 closing, principally by using nominee accounts, by prearranged "swap" transactions with other broker-dealers, and by dumping large blocks of inflated units upon the Vanguard and Hedge Funds which were victimized by conniving fiduciaries, Drucker and Kleinman.

The complaint alleges that the foregoing acts constitute a number of violations of the securities laws.[2]

## THE BENEFICIAL OFFERING

On December 20, 1971, Commonwealth, as underwriter, commenced a public offering of 100,000 units of Beneficial securities, at a price of $2.25 per unit, under Regulation A,[3] the small issue exemption from registration. Each unit consisted of one share of common stock and one warrant, immediately exercisable for the purchase of another share of common at $2.25. According to its terms, the offering would fail unless at least 50,000 units were sold by its ninety-day termination date, March 19,

---

**2.** Specifically, Commonwealth, Drucker and Kleinman are charged with violating Sections 5 and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e and 77q(a); Sections 10(b), 15(c) and 17(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78o (c) and 78q(a), and Rules 10b–5, 10b–6, 15c2–4, 17a–3 and 17a–4 promulgated thereunder, 17 C.F.R. §§ 240.10b–5, 10b–6, 15c2–4, 17a–3 and 17a–4; and Sections 17(a) and (d), 36(a), 37 and 48(a) of the Investment Company Act, 15 U.S.C. §§ 80a–17(a) and (d), 80a–35(a), 80a–36 and 80a–47(a), and Rule 17d–1 promulgated thereunder, 17 C.F.R. § 270.17d–1.

Drucker and Kleinman are also charged with violating Section 206(1) and (2) of the Investment Advisers Act ("Advisers Act"), 15 U.S.C. § 80b–6(1) and (2).

Defendant DK & B is charged with violating Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder; Sections 17(a) and (d), 36(a), 37 and 48(a) of the Investment Company Act and Rule 17d–1 promulgated there-

under; and Section 206(1) and (2) of the Advisers Act.

Defendants Sharpe and Guttman are charged with violating Section 17(a) of the Securities Act; Sections 10(b) and 17(a) of the Exchange Act and Rules 10b–5, 17a–3 and 17a–4 promulgated thereunder.

Defendant Marlane Kleinman is charged with violating Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.

Jurisdiction is invoked under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a); Section 27 of the Exchange Act, 15 U.S.C. § 78aa; Sections 36(a) and 44 of the Investment Company Act, 15 U.S.C. §§ 80a–35(a) and 80a–43; and Section 214 of the Advisers Act, 15 U.S.C. § 80b–14.

We feel constrained to note at this point that the failure of the SEC to focus the factual and legal basis for this action by use of the umbrella statute, Section 10(b), has confused the presentation of the evidence, burdened this court and delayed decision.

**3.** 17 C.F.R. § 230.251–263.

1972. The offering represented that all money received from subscribers would be deposited in a special bank account maintained by Commonwealth, as trustee for the subscribers, at the American Bank & Trust Company ("American Bank") and that all the subscribers' funds "will be refunded in full" if less than 50,000 units were sold by the termination date.

A "due diligence" conference, attended by defendant Kleinman; Emanuel Brown, counsel to Commonwealth; John Feldman, president of Beneficial; and Alan Geiss, attorney for Beneficial, was conducted in December 1971 by a Mr. Bienenstock, an attorney for the SEC. The purpose of the conference was to inform the persons involved in the offering of their duties and obligations.

Accordingly, Bienenstock advised that all money received from subscribers should be deposited in a special account until the minimum number of units had been sold, but that, if the minimum number were sold before the termination date, a closing should be held at that point, and that further closings, if any, should be held weekly until the termination date of the offering. Bienenstock specifically instructed that the offering would fail if the minimum of 50,000 units were not sold by March 19, 1972 and that, in that event, all money received from subscribers would have to be returned.

█ The offering circular was amended on March 8, 1972 to indicate that "[t]he within Offering was terminated on March 8, 1972. As of such date, 50,-650 Units had been sold and paid for and the Company [Beneficial] received net proceeds of $94,033.75." This language clearly implied that by March 8, 1972 the goal had been surpassed and that Commonwealth had received and deposited the full purchase price for 50,650 units in the special account. The implicit representation was made express by Klein-

man's advising the SEC in writing, on March 8, 1972, that Commonwealth had subscribers for 50,650 units and that a closing would be held within a few days.[4] He enclosed a list of subscribers and the number of units each had bought. Moreover, a closing was held on March 10, 1972, and Beneficial delivered certificates for 50,650 units to Commonwealth in exchange for two checks, totalling $94,033.75, drawn on the special account. That sum constituted the entire balance in the special account.

The SEC claims that, despite Bienenstock's specific instructions and the plain representation of the offering circular, the $94,033.75 deposited by Commonwealth was not the amount it should have received from subscribers if 50,650 units had in fact been sold, since the full price of the units, according to the offering, would be $113,962.50 ($2.25 per unit x 50,650).

Defendant explains the discrepancy as the full purchase price ($113,962.50) less Commonwealth's commissions ($19,-928.75). While Commonwealth was entitled to commissions of $19,928.75 on the sale of 50,650 units under the terms of the offering, the bank statement shows that the special account never contained more than $94,033.75 at any time prior to the closing. This leads to two alternative inferences: either (1) that 50,650 units had not been sold, or (2) that Commonwealth had taken its commissions before depositing the subscribers' money into the special account. We will now explore the first of these inferences.

The SEC claims that, contrary to their representations, defendants failed to sell the minimum number of units and that defendants Drucker, Sharpe and Guttman placed several thousand units in nominee accounts to camouflage the failure.

Joanne Reichin, a former Commonwealth employee, testified that, upon Drucker's request, she furnished the

---

**4.** Although this letter was received as evidence at the preliminary injunction hearing, it becomes part of the trial record and may be considered in our findings. Rule 65(a)(2), Fed. R.Civ.P.

names of four friends—Sheila Goldberg, Mary Boilen, Sherry Ashen and Alice Greenblatt—for use on nominee accounts. Those four names also appear on the list of subscribers sent by Kleinman to the SEC, showing that each had bought 2,000 units. Drucker admitted using those names on nominee accounts but denied using them for the purpose of camouflaging a failure of the offering. He claimed that the nominees were used because the true purchaser of the total 8,000 units, a Mr. Massad, instructed him to put the units in the names of nominees.

Drucker testified that on March 10, 1972 he sent these units to Massad in Massachusetts on a "delivery against payment" basis, through the American Bank, which gave him an immediate credit against delivery, but that, due to a mix-up, Massad's bank in Massachusetts was not informed of the transaction and returned the units. According to Drucker, the units were again sent to Massachusetts and were finally received on March 16, 1972, six days after the closing. Drucker also testified that, a few weeks later, Commonwealth, in a private transaction, repurchased the 8,000 units from Massad.

We find Drucker's testimony on this matter incredible. Defendants' failure to call Massad; Drucker's use of nominees selected by his subordinate, Reichin; Massad's failure to pay for his units before the termination date, as other subscribers had done; and Commonwealth's repurchase of the units in a private transaction shortly after the closing compel the conclusion that Massad was not a bona fide purchaser but a mere tool of the defendants for camouflaging the failure of the offering.

We find, therefore, that Commonwealth, contrary to the representations made in the offering circular, as amended, and in Kleinman's letter to the SEC, had not sold 50,650 units by March 8, 1972; nor had it received and deposited the sales price for such units.

The SEC claims that defendants Sharpe and Guttman also participated in this attempt to camouflage the failure of the Beneficial offering by placing a number of units in nominee accounts.

Defendant Sharpe opened an account at Commonwealth in the name of her mother, Nellie Pyles, and purchased 1,000 Beneficial units before the termination date. Sharpe testified that she intended to give any profits to her mother. Soon after March 8, 1972, however, she sold 500 units at a small profit, took the check for the proceeds which she had drawn to the order of Nellie Pyles, endorsed her mother's name, and deposited the funds in her own bank account. The profits realized on this sale were never given to her mother. In fact, Nellie Pyles was completely ignorant of this account and of the transactions allegedly conducted for her benefit.

Sharpe explained that, because of some forgotten dispute with her mother, she failed to give her the profits. We find this "gift" explanation incredible and, therefore, conclude that Sharpe did use her mother's name to cloak her own interest in the account.

Sharpe also testified that she opened this account and made the purchase only after consulting with Mr. Brown, counsel to Commonwealth. Brown did not squarely corroborate Sharpe but testified generally that, in response to several inquiries, he advised that it would not be improper for the relatives of Commonwealth employees to buy Beneficial units provided they were bona fide purchasers. Clearly, this does not exculpate Sharpe, for Nellie Pyles was not a bona fide purchaser; it was Sharpe alone who made the purchase, controlled the account, and received the profits from the sale of the units.

We find on a balance of all of the evidence, including Sharpe's relationship as Commonwealth's bookkeeper, the timing of the transaction, the then significance of 1,000 units to the target quantity, and the spurious explanation given on the stand, that Sharpe was knowingly attempting to aid and participate in the fraudulent closing of the offering, with some stake in its success, even though

there is no direct evidence that the funds used were not her own or that she acted at the express request of Drucker, Kleinman, or anyone else.

The SEC also claims that defendant Guttman was beneficially interested in an account at Commonwealth in the name of "Sylvia Pavel, custodian for Yitzchok." Kleinman listed that account as a subscriber for 1,000 units in his letter to the SEC.

The evidence shows that Pavel is Guttman's cousin and that Yitzchok is Pavel's son. Guttman testified that he had a loose, verbal arrangement to make loans to Pavel for the purchase of securities. According to Guttman, sometime in late 1971, Pavel opened an account at Commonwealth with funds supplied, at least in part, by Guttman. Guttman admitted that Pavel never signed a "new account card," that he suggested that Pavel buy some Beneficial units, and that 1,000 units were bought using funds from the account. Those funds, Guttman said, had been realized from the sale of other securities. Guttman also testified that, after the closing, he directed that the units be sold and that the proceeds were sent to Pavel. He claimed that, soon thereafter, he received a "loan" from Pavel, but denied having any beneficial interest in the account.

Guttman's testimony is incredible. Not a scrap of paper was offered to support his story. More significantly, his testimony is contradicted by his own prior admissions to the SEC that the Beneficial units were purchased "with my funds, basically," and that "the stock is for my interest." Finally, Drucker testified, on cross-examination, that Guttman had told him that he had a "partnership interest" in the Pavel account.

■ The evidence is overwhelming that Guttman had an interest in the Commonwealth account carried as "Sylvia Pavel, custodian for Yitzchok." He admitted that he was the source of at least some of the funds used to buy the Beneficial units, that he had suggested their purchase, that he had discretionary authority over the account which he exercised when he directed the sale of the units, and that he had received a "loan" after the units had been sold. As was the case with Sharpe, in light of all the circumstances there considered, which are even more significant here, we find that Guttman knowingly participated in this fraudulent scheme by causing this purchase to camouflage the failure of the Beneficial offering.

It seems unnecessary, in view of the above findings, to discuss the second possible inference that could be drawn from the discrepancy in the bank statement, that is, that the discrepancy was caused by Commonwealth's taking its commissions before depositing the subscribers' funds. Defendants, however, have urged that inference, and we should, therefore, consider it.

Defendants failed to present any creditable evidence that their contention is true, but, even if it were, they would, nevertheless, be liable for making false representations. The offering circular expressly represents that *all* money received from subscribers would be deposited in the special account, not that the underwriter would first deduct commissions and then deposit only the remainder. Nor did defendants even attempt to answer the troublesome question of how Commonwealth could take its commissions in good faith before it was entitled to them under the terms of the offering, *viz.*, before the successful closing? Absent participation in a fraudulent engineering of the closing, no one could be prescient enough to know that a particular offering will succeed before that event actually occurs. In short, we reject defendants' contention that the discrepancy was caused by the premature taking of commissions as wholly untenable and inconsistent with the facts which we have already found.

We turn now to the second claim that, after the closing, the defendants artificially manipulated the market in Beneficial securities.

## MANIPULATION

The SEC contends that, following the March 10, 1972 closing, defendants Commonwealth, Drucker, Kleinman, DK & B, Marlane Kleinman, Sharpe, and Guttman artificially inflated the price of Beneficial securities by dominating the market through trading in accounts directly under their control.

Drucker and Kleinman controlled the Commonwealth trading account, as well as individual accounts in their own names. Drucker admitted that he also controlled three accounts in his name, as custodian for his children, Cheryl, Julie, and Susan, and other accounts in the name of Lori Rukasin, his sister-in-law.

There were two accounts maintained at Commonwealth in the names of Dorothy Drucker and Dorothy Rukasin (Mrs. Drucker's maiden name). Mrs. Drucker testified that she never authorized anyone to open an account in her name and that she never participated in any transactions involving Beneficial securities. Defendant Drucker, while denying any beneficial interest in these accounts, admitted that he made all investment decisions for his wife. These two accounts were, therefore, under his direct control.

There is no dispute that defendant Kleinman made all investment decisions on behalf of the account in the name of his sister, Regina Sinofsky.

Drucker and Kleinman were also principals of both the Vanguard and Hedge Funds, as well as of DK & B, and, as such, made all investment decisions for the funds during the period that DK & B acted as investment advisor.

To recapitulate, we find that defendants Commonwealth, Drucker, Kleinman and DK & B controlled the following twelve accounts: (1) Commonwealth Trading Account; (2) Robert Drucker; (3) Dorothy Drucker; (4) Dorothy Rukasin; (5) Lori Rukasin; (6) Robert Drucker, custodian for Cheryl; (7) Robert Drucker, custodian for Susan; (8) Robert Drucker, custodian for Julie; (9) Julius Kleinman; (10) Regina Sinofsky; (11) Vanguard Fund; and (12) Hedge Fund (Berkeley Dean Special Fund).

Three charts, prepared by Mr. Judkowitz, an employee of the SEC, were received in evidence upon the hearing for a preliminary injunction. The first, Exhibit 7, shows the trading in Beneficial common stock from March 10, 1972 to February 27, 1973; the second, Exhibit 9, the trading in Beneficial warrants from March 10, 1972 to February 15, 1973; and the third, Exhibit 10, the trading in Beneficial units from March 10, 1972 to January 10, 1973.[5]

Mr. Judkowitz testified that, in preparing these charts, he relied upon original order tickets, if available, or confirmation statements.[6] He had obtained these documents from the market makers in Beneficial securities, as reflected in the National Quotation Bureau's "pink sheets" or from other broker-dealers who traded with the market makers.

These charts, we find, reveal with a reasonable degree of accuracy what they purport to show, that is, trades in Beneficial securities in which market makers were involved. After careful study of them, we make the following findings:

The accounts controlled by defendants Commonwealth, Drucker, Kleinman, and DK & B participated in an extraordinarily large number of transactions involving Beneficial securities. These accounts, for example, participated in about 70% of all transactions in Beneficial common stock from March 10, 1972 to February 23, 1973, 41% on the buying side. In 9% of all these transactions, controlled accounts were on both the buying and the selling sides.

Similarly, accounts controlled by these defendants participated in about 67% of

---

**5.** These charts do not reflect any transactions which may have occurred between broker-dealers who were not themselves market makers and who did not deal with market makers.

**6.** These documents were produced in the courtroom and were open to inspection by all counsel.

all transactions in Beneficial warrants and 51% of all transactions in Beneficial units. Overall, during the period reflected by the charts, these accounts participated in about 66% of all transactions involving any of the three types of Beneficial securities. In 40% of all transactions, these accounts were on the buying side, and in 7.5% they were on both sides.

These figures become even more significant when compared with the rapid increase in the price of the securities. Beneficial common stock, for example, rose from a price of $4 bid—$5 offer on March 14, 1972 to $14 bid—$15 offer by the end of September 1972. Similar increases occurred for Beneficial units and warrants. During this period, however, no earnings were reported by Beneficial. Drucker testified that Beneficial was "doing well" and that prospects looked good "on the horizon." It is utterly incredible, however, that it was the performance of Beneficial which prompted the dramatic increase in the price of its securities.

The foregoing, without more, strongly suggests that Commonwealth, Drucker, Kleinman, and DK & B were involved in a fraudulent scheme to manipulate trades and artificially inflate the price of Beneficial securities. Other evidence, however, establishes that these defendants, at the very least, participated in a number of transactions in which their bad faith cannot be doubted.

Vincent Caccesse, formerly a representative and trader with the brokerage firm of A. C. Kluger, a market maker for Beneficial securities, testified that on September 19, 1972 Drucker telephoned to open an account for the Berkeley Dean Special Fund (later known as the Hedge Fund) and ordered 8,000 shares of Beneficial common stock. When Caccesse reported that he was unable to fill such a large order through a number of market makers, Drucker suggested that he try Commonwealth which Caccesse did with instant success.

Commonwealth's ready ability to supply so large a block warrants the inference that it had sufficient control to dominate and direct trading in Beneficial securities. Furthermore, that Drucker was manipulating the market is clear from the indisputable fact that behind the scenes he was on both sides of the transaction, dealing with himself in his dual and conflicting roles as a director and investment advisor of the buyer, Berkeley Dean Special Fund, and as president of the seller, Commonwealth.

There is also evidence of similar self-dealing by Drucker in August 1972, when, through Amherst Securities, another broker-dealer, he sold 7,000 shares of Beneficial common stock from the account of Lori Rukasin, which he controlled, to the Vanguard Fund, of which he was an officer and investment advisor.

Another example of these "bad faith" transactions is the so-called "swap" transaction between Commonwealth and Cabot Shaw, another broker-dealer. Gerald Wolff, formerly a trader at Cabot Shaw, testified that, in February 1973, he and Drucker negotiated a dollar-for-dollar exchange of stock between Commonwealth and Cabot Shaw, under which Cabot Shaw purchased 2,000 units of Beneficial, at $35 per unit (total = $70,000), and Commonwealth purchased 4,500 shares of Environmental Devices, Inc. ("EDI"), stock, at $7¾ per share (total = $34,875). According to Wolff, Joseph Arner, Kleinman's uncle, completed the transaction by purchasing 5,000 EDI shares, at $7¾ per share (total = $38,750).[7]

Wolff's testimony was corroborated in part by Drucker, who admitted that an exchange of securities between Commonwealth and Cabot Shaw had indeed occurred. He acknowledged that Cabot

---

7. Wolff admitted that he had lied in several material aspects at two depositions conducted by the SEC. He claimed, however, that his trial testimony was true. After careful observation of this witness and in light of the other evidence produced at trial, we believe that his story at trial is truthful, notwithstanding his past perjury.

Shaw's purchasing of the Beneficial units "was an inducement" to Commonwealth's buying the EDI shares. He also testified that Kleinman had spoken to him and to Arner in early February 1973 about Arner's opening an account at Cabot Shaw. Drucker denied, however, that he arranged the Arner purchase of 5,000 EDI shares as part of the "swap" transaction.

The SEC placed in evidence copies of confirmation slips relating to the "swap" transaction. They show that three things occurred on February 15, 1973: (1) Cabot Shaw purchased 2,000 Beneficial units, at $35 per unit, from Commonwealth; (2) Commonwealth purchased 4,500 EDI shares, at $7¾ per share, from Cabot Shaw; and (3) Joseph Arner, through his account at Cabot Shaw, purchased 5,000 EDI shares, at $7¾ per share, from the Cabot Shaw trading account.

We find from all of the evidence that defendants Drucker and Kleinman negotiated and carried out a dollar-for-dollar "swap" of securities between Commonwealth and Cabot Shaw and that, as part of this transaction, Drucker and Kleinman arranged the Arner purchase of 5,000 EDI shares. We note in this regard that Kleinman and Drucker, at the very least, knew of the Arner account at Cabot Shaw; that the Arner purchase nearly equalized the dollar values of the securities exchanged; and that Arner's purchase occurred on the same day as the direct exchange between the two brokerage firms.[8]

This type of transaction introduces a foreign element—a prearranged business *quid pro quo*—to those which normally establish the price of a particular stock, namely, supply and demand in a public auction market, free from artificial manipulation, and the performance of the issuing company in a system of free competitive enterprise. Such a transaction is manipulative both because it tends to support an artificial and inflated price for the securities and because it portrays a false appearance of wide investor interest.

■ In a free and open public market, it is the competing judgments of numerous buyers and sellers in an auction which establishes the fair price of a security. When individuals, occupying a dominant market position, undertake a scheme to distort the price of a security for their own gain, they violate the securities laws by perpetrating a fraud on all public investors.

■ Here, there can be no question that Drucker, Kleinman and Commonwealth misused their dominant market position to manipulate trading and inflate the price of Beneficial securities artificially for their own gain, at the expense of the investing public. Defendants' argument that the over-the-counter market cannot be manipulated, since prices are not reported on a stock exchange,[9] borders on the frivolous. The quotations which appear in the "pink sheets" serve as a guide to the price of securities in the over-the-counter market. The price shown in the pink sheets, therefore, did not represent the true market value of Beneficial securities but reflected the artificial price resulting from defendants' manipulation. Defendants directly contributed to the pink sheet quotations for Beneficial securities by their manipulated dealings with market makers. As we have seen, these transactions were not bona fide but were rigged purchases by controlled accounts and prearranged dollar-for-dollar swaps.

**8.** This finding that Arner participated in the "swap" transaction raises doubts about the bona fides of other transactions to which he was a party. For example, in light of Drucker's and Kleinman's use of nominee accounts to orchestrate the "success" of the Beneficial offering, Arner's subscription to 1,000 units appears questionable. Also, Arner participated in a number of trades during the period of manipulation of the Beneficial market by defendants. Arner's role throughout the relevant time period appears, at the least, to be suspicious. However, as he is not a defendant in this case, we need go no further.

**9.** See, *e. g., SEC v. Resch-Cassin & Co.*, 362 F.Supp. 964 (S.D.N.Y.1973).

The SEC claims that Sharpe, Guttman and Marlane Kleinman participated in the scheme to inflate the price of Beneficial securities artificially through various accounts under their control.

We have previously discussed Guttman's control over the Sylvia Pavel account and Sharpe's control over the Nellie Pyles account. In addition, Sharpe maintained an account at Commonwealth in her own name.

It is not disputed that Marlane Kleinman opened an account under the name of Marcia Klein at Merrill Lynch, Pierce, Fenner & Smith and that she purchased 100 Beneficial units on October 17, 1972 and 500 units on November 20, 1972. Later, on January 10, 1973, Commonwealth bought 500 units from her Merrill Lynch account. At no time did Marlane Kleinman offer any evidence to refute any of the charges made against her.

While the number of transactions in which Sharpe, Guttman and Marlane Kleinman participated and the relative amounts involved are not large, they, more or less, coincided with the manipulations of Drucker and Kleinman, and there is no blinking the fact that each of these defendants was inextricably linked to those dominant insiders and that a fair preponderance of the evidence indicates that they must have known of the fraudulent scheme.

We have already noted Sharpe's and Guttman's connection with the fraudulent closing of the Beneficial offering. And during the period of market manipulation, they remained insiders at Commonwealth.

Marlane Kleinman is Kleinman's wife, and there are two telling circumstances concerning her transactions:

First, we note that Commonwealth sold 100 Beneficial units, at $32¾ per unit, to Hill, Thompson, Magid & Co., another broker-dealer, at 12:00 noon on October 17, 1972. Six minutes later, at 12:06 P.M., Hill, Thompson, Magid & Co. sold 100 Beneficial units, at $33 per unit, to Merrill Lynch for the account of Marcia Klein. It is difficult to understand why Marlane Kleinman bought in this circuitous manner rather than by dealing directly with her husband's firm, thus saving at least a fourth of a point per unit, unless, of course, she was interested not in obtaining the lowest possible price but in participating in camouflaging the transaction and in creating the false appearance of wide investor interest through the involvement of other broker-dealers.

Second, we note the "coincidence" that ultimately, on January 10, 1973, Commonwealth bought 500 units from Marlane Kleinman's account at Merrill Lynch, thus completing the circle.

We find on a balance of all the evidence that Sharpe, Guttman and Marlane Kleinman were in a position to know of the illegal scheme, saw an opportunity to make substantial profits, participated in the trading, and negligently, if not knowingly, aided the manipulation. This was a scheme in which "every little bit helps," and these defendants, dependent upon either Drucker or Kleinman, dutifully assisted the unlawful plan.

We turn now to the SEC's claim that Drucker, Kleinman and DK & B misused the assets of the Hedge and Vanguard Funds to accomplish the ends of their manipulative scheme, resulting in substantial losses to the funds.

## FUND TRANSACTIONS

As we have previously mentioned, Drucker and Kleinman were responsible for the investment decisions of the Hedge and Vanguard Funds through DK & B. In addition, the boards of directors of both funds were identical: Drucker, Kleinman and two "outside" directors whom they recruited, Dr. Smith and Dr. Dash.

■ Drucker and Kleinman took advantage of their dual and conflicting roles by causing the funds to buy, and Commonwealth to unload, large amounts of Beneficial securities at artificially inflated prices. We have already discussed two such transactions. Through various

transactions, the funds bought a total of 22,100 shares of Beneficial common stock, at a cost of $177,012.50, and 3,000 warrants, at a cost of $43,125. The callous disregard of fiduciary duties, brazen conflict of interest, and fraudulent self-dealing thus mulcted the funds of $220,137.50.

There are still other instances of fraudulent dealing by these fiduciaries. Wolff testified that in late February 1973, Drucker asked Cabot Shaw to buy 5,000 shares of EDI from Commonwealth and to sell them to the Vanguard Fund. When Wolff questioned Drucker's authority to buy for the fund, he was informed that a principal of the fund would call him. Fifteen minutes later, Kleinman telephoned Wolff and assured him that Drucker was authorized to buy for the fund. The sale was consummated; Cabot Shaw bought the shares from Commonwealth, at $7⅝ per share, and sold them to Vanguard at $7¾ per share. This calculated self-dealing by Drucker and Kleinman demonstrates their blatant breach of their fiduciary obligations to deal faithfully for the benefit of the shareholders of the funds.

Dr. Smith, one of the funds' "outside" directors, attended a directors' meeting called by Drucker in December 1972. He learned, to his surprise, of the "large position" both funds had in Beneficial securities. Nevertheless, Drucker urged that the funds hold the shares because a sale of such a large block would depress its market price. He suggested, instead, a 10% devaluation in the portfolio value of the securities.

At another meeting of the directors of the funds, held in late February 1973, Smith learned that Commonwealth had been the underwriter for the Beneficial offering and that the SEC was investigating Beneficial. This meeting was continued two days later, and the discussion centered on the conflict of interest of Drucker and Kleinman and on the need for new management.

The SEC suspended trading in Beneficial securities on March 5, 1973, and in May 1973 David Rosen was retained as attorney for the funds. He was informed that there were serious problems because of the funds' substantial holdings of Beneficial securities. It was decided that the Hedge Fund should be liquidated and dissolved and that the Vanguard Fund should transfer its assets to the Pilgrim Fund, Inc. ("Pilgrim Fund") in exchange for Pilgrim Fund shares to be distributed in a tax-free reorganization to the former shareholders of Vanguard Fund. Rosen prepared proxy materials to obtain the permission of the shareholders of each fund to proceed with this plan.

The proxy materials show that, as of March 2, 1973, the last trading date before the SEC suspended trading in Beneficial securities, the net asset valuation of the Hedge Fund was $329,929. Of this amount, in excess of $260,000 was attributed to the valuation of Beneficial securities; fully 71.1% of the total valuation. Similarly, on that date Vanguard Fund's net asset valuation was $1,184,776, of which $210,000 was attributed to the valuation of Beneficial securities, or approximately 17.7% of the total valuation.

The funds were unable to sell their Beneficial holdings publicly for the SEC had suspended trading. A search for a private buyer proved fruitless until September 1973, when Ofinco, Inc. offered to buy the Beneficial shares. Dr. Smith and Dr. Dash, the only remaining directors of the funds, rejected the offer, anticipating that the suspension would be lifted. The suspension was lifted on October 31, 1973, but there was still no public market for the securities. Ofinco, Inc. made a new offer, which was accepted, to purchase the funds' holdings of Beneficial securities, at $.48¾ per share for the common stock and $.12½ per warrant. As a result, the funds sustained an aggregate net loss of $158,345.[10]

---

10. A 100% stock dividend was declared in January 1973 thus increasing the funds' hold-

ings to 44,200 shares of common stock, and 3,000 warrants. Prior to the trading suspen-

The Insurance Company of North America disclaimed liability on fidelity bonds when the funds sought to recoup their losses. The Hedge Fund was in the process of liquidation at the time of trial and had retained about $7,000 in assets, most of which was earmarked for taxes, accounting fees and other expenses. The Vanguard Fund was transferring its assets to the Pilgrim Fund and had approximately $7,000 remaining at that time.

## VIOLATIONS OF THE SECURITIES LAWS

*Commonwealth, Drucker and Kleinman.*

It is clear that Commonwealth, Drucker and Kleinman are liable for several violations of the securities laws. We note initially that throughout the relevant time period they used the mails, telephone and other means of interstate commerce in their various transactions.

As we have previously detailed, these defendants failed to sell the minimum of 50,000 Beneficial units prior to the March 8, 1972 termination date of the offering. Nevertheless, they caused a closing on the issue to be held on March 10, 1972.

A subscriber to an offering, made on a "part or none" representation, is assured that he will be entitled to a full refund of his money if the security fails to appeal to a sufficient number of investors to reach the minimum limit. These defendants, however, knowing that sales to the public were falling short of the required 50,000 unit minimum, disguised the investing public's rejection of the offer by spurious sales to controlled accounts and by closing the issue knowing full well that 50,000 units had not been sold.

■ There can be no question that their conduct constitutes a scheme, arti-

fice and device to defraud by means of both false representations and non-disclosure of material facts, in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act.

■ Drucker, Kleinman and Commonwealth also violated Section 15(c)(2) of the Exchange Act and Rule 15c2–4 promulgated thereunder. Section 15(c)(2) makes it unlawful for a broker to effect any transaction in any security not on a national securities exchange where such broker "engages in any fraudulent, deceptive, or manipulative act or practice, or makes any fictitious quotation." Rule 15c2–4 defines a "fraudulent, deceptive or manipulative act or practice" as, in an "all or none" distribution (or a "part or none" distribution, as in the present case), the acceptance by a broker of any part of the sales price of the security being distributed unless:

"the money or other consideration received is promptly deposited in a separate bank account as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted to the persons entitled thereto. . . ."[11]

Drucker, Kleinman and Commonwealth did not, upon the failure of the Beneficial offering, return the subscribers funds, as they should have, but caused a fraudulent closing to be held. Thus, they violated Section 15(c)(2) of the Exchange Act and Rule 15c2–4 promulgated thereunder.

■ It is also asserted that Commonwealth, Drucker and Kleinman violated Rule 10b–6, which provides that it is a manipulative or deceptive device or contrivance under Section 10(b) of the Exchange Act for any underwriter or bro-

sion of Beneficial, the Hedge Fund sold 3,600 shares of common stock, realizing a total of $41,625. The sale of the remaining securities to Ofinco, Inc. resulted in proceeds of $20,-167.50. Thus, the total purchase price ($220,-137.50), minus the total sale price ($41,625 + $20,167.50 = $61,792.50), equals the net

aggregate loss of $158,345. The Vanguard Fund suffered a net loss of $66,325, and the Hedge Fund suffered a net loss of $92,020.

11. 17 C.F.R. § 240.15c2–4(a)(2)(A).

ker, participating in any distribution of securities, to:

"bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution . . . until after he has completed his participation in such distribution. . . ."

Since Commonwealth had not sold the minimum of 50,000 units by March 10, 1972 and, therefore, had not "completed" its participation in the offering, and in light of the fact that, following the closing, these defendants immediately commenced trading in Beneficial securities, we conclude that Commonwealth, Drucker and Kleinman have violated Rule 10b–6.

▮ The SEC claims that Drucker, Kleinman and Commonwealth violated Section 5(a) and (c) of the Securities Act in that they sold Beneficial securities at a time when no registration statement was in effect.

It is not disputed that the Beneficial offering was made pursuant to an exemption from registration under Section 3(b) of the Securities Act and Regulation A promulgated thereunder, the so-called "small issue" exemption.[12] Plaintiff contends that defendants' fraud vitiated the exemption. We reject the contention.

The case of *United States v. McGuire*, 249 F.Supp. 43 (S.D.N.Y.1965), *aff'd*, 381 F.2d 306 (2d Cir. 1967), *cert. denied*, 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968), cited by plaintiff, is distinguishable. There, the district court found that three corporations were organized and controlled by defendant McGuire in furtherance of a conspiracy to evade the registration requirements of the Securities Act. Each corporation, in turn, filed for the Regulation A exemption and commenced the sale of stock. The court held that Section 5 of the Securities Act

was violated because the corporations were "affiliated" and their combined offering exceeded the maximum amount allowable under Regulation A, that is, these offerings were ineligible for the exemption by the terms of the regulation itself.

There is no question in the instant case that the Beneficial offering was eligible for the small issue exemption initially. However, plaintiff claims that the exemption was vitiated *ab initio* by defendants' subsequent fraudulent conduct. Plaintiff cites no authority in support of its contention, and we have found none.

▮ We have found no evidence of any fraudulent intent, plan or scheme on the part of defendants, prior to or at the time of the granting of the Regulation A exemption, and, absent such evidence, we think *McGuire* inapplicable. We conclude that, despite the subsequent violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, the small issue exemption was not vitiated but remained in effect throughout the Beneficial offering and, therefore, no violation of Section 5 of the Securities Act occurred.[13]

▮ It is alleged that Commonwealth, aided and abetted by Drucker, Kleinman, Sharpe and Guttman, violated the bookkeeping rules of the Exchange Act[14] in that its records did not reflect the beneficial owners of certain accounts, namely, the Goldberg, Boilen, Greenblatt, Ashen, Pyles and Pavel accounts. We find that this allegation has been established.

Drucker admitted using the names of Reichin's four friends as nominees for Massad. Similarly, Sharpe disguised her interest in the Beneficial securities in the Nellie Pyles account, and Guttman did the same with respect to the Pavel

12. 17 C.F.R. § 230.251–263.

13. Regulation A provides that the SEC may suspend the exemption under certain circumstances, including the violation of the antifraud provisions of the Securities Act. An exercise of this power, which did not occur in

this case, is not binding on the court's determination as to whether the exemption was in effect at any particular time. See *United States v. McGuire, supra.*

14. 15 U.S.C. § 78q(a) and 17 C.F.R. § 240.17a–3.

account. Kleinman showed his complicity by authoring the March 8, 1972 letter to the SEC containing names of fictitious subscribers. Thus, these accounts did not reflect the names of the beneficial owners. These defendants, therefore, violated the bookkeeping rules.

■ Immediately subsequent to the closing, Commonwealth, Drucker and Kleinman commenced trading in Beneficial securities in a manner calculated to inflate their price artificially. The dominance of the trading by accounts under their direct control, the manipulation of the market through prearranged swap transactions, and the sale of substantial blocks of these securities to the Hedge and Vanguard Funds constituted a fraud upon innocent investors during this period and a violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5.

■ In addition, Drucker, Kleinman and Commonwealth violated provisions of the Investment Company Act. Section 17(a) of the Investment Company Act forbids an "affiliated person" of a registered investment company, or "any affiliated person of such a person," from knowingly selling any security to that investment company. Both the Hedge and Vanguard Funds were registered investment companies. Drucker and Kleinman, as directors of the funds, were "affiliated persons," as defined by the Act,[15] and Commonwealth was affiliated with them.[16]

Section 48(a) of the Investment Company Act provides:

"It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this sub-

chapter or any rule, regulation, or order thereunder."

Perhaps the clearest, but by no means the only, violation of these statutes is the transaction in which Drucker requested Cabot Shaw to purchase 5,000 shares of EDI from Commonwealth and to sell them to the Vanguard Fund. Kleinman telephoned Wolff at Cabot Shaw to assure him that Drucker had authority to place an order for the fund. Thus, these defendants attempted to disguise the violative nature of this transaction by interpositioning Cabot Shaw between Commonwealth and the fund. We conclude, therefore, that these defendants violated Sections 17(a) and 48(a) of the Investment Company Act.[17]

■ Commonwealth, Drucker and Kleinman have also been charged with violating Section 36(a) of the Investment Company Act in breaching their fiduciary duties toward the funds by fraudulently steering and engineering both sides of the various transactions in Beneficial securities. In light of the clear showing that these defendants acted purposefully in their dual and conflicting roles in placing large blocks of Beneficial securities with the funds at the same time they were artificially inflating the price of the securities, we conclude that they violated Section 36(a) of the Investment Company Act.

■ The SEC also claims a violation of Section 37 of the Investment Company Act, which makes it a crime to steal, embezzle or convert funds or assets of a registered investment company. That statute has been construed to give an implied right of private civil action for its violation.[18] Although we have found no case in which the SEC brought suit to enforce this statute, we believe that the SEC may do so under its broad powers to compel compliance with the securities laws.

---

**15.** 15 U.S.C. § 80a–2(a)(3)(D).

**16.** 15 U.S.C. § 80a–2(a)(3)(C).

**17.** The SEC has not, in its post-trial briefs, pressed its allegation that Section 17(d) of the Investment Company Act and Rule 17d–1 pro-

mulgated thereunder have been violated. In light of this, we will not consider this allegation.

**18.** *Brown v. Bullock,* 194 F.Supp. 207 (S.D.N.Y.), *aff'd,* 294 F.2d 415 (2d Cir. 1961).

What must be shown to constitute a violation of this statute? In *Tanzer v. Huffines,* 314 F.Supp. 189 (D.Del. 1970), the court stated:

"Conversion, as used in the Act, includes misuse or abuse of property. It also includes use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." [19]

Applying that test, we conclude that the wilful misconduct of Drucker, Kleinman and Commonwealth, in using the assets of the funds in their unlawful scheme to inflate and artificially support the price of Beneficial securities and in "dumping" large blocks of these watered securities on the funds, constitutes a misuse of assets entrusted to them sufficient to violate Section 37 of the Investment Company Act.

*DK & B.*

DK & B, as investment advisor to the funds, was used by Drucker and Kleinman in their unlawful scheme to defraud. We conclude, therefore, that DK & B violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, and Sections 17(a), 48(a), 36(a) and 37 of the Investment Company Act.

In addition, DK & B, aided and abetted by Drucker and Kleinman, is charged with violating Section 206(1) and (2) of the Advisers Act. This statute provides:

"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

Since the mails were used to accomplish the fraudulent scheme of Drucker, Kleinman and DK & B which we have found, this statute was clearly violated by them.

*Sharpe and Guttman.*

We have already concluded that Sharpe and Guttman violated the bookkeeping provisions of the Exchange Act (Section 17(a) and Rule 17a–3) in their use of the Pyles and Pavel accounts. The SEC also claims that they have violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder in lending assistance to the fraudulent closing of the Beneficial offering and to the manipulation of the market after the closing.

It has been held that a negligence standard applies in measuring the civil liability of an individual charged with having aided and abetted a securities law violation.[20]

"The test therefore is whether the 'defendant should have been able to conclude that his act was likely to be used in furtherance of illegal activity.' Knowledge that a violation is being committed and intent to further the illegal act is not required." [21] (Citations omitted.)

Applying this test, there is no question that these defendants, as insiders at Commonwealth, were in a position to realize that their actions would further the illegal activities of Drucker and Kleinman and, in the exercise of reasonable care, should have concluded from the facts we have found pertaining to them that their acts would be used to further the scheme to defraud. Sharpe and Guttman, therefore, violated Section 17(a) of the Securities Act, Section 10(b)

---

19. 314 F.Supp. at 194.

20. *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2d Cir. 1973).

21. *SEC v. Rega,* CCH Fed.Sec.L.Rep. [Current] ¶ 95,222, at 98,146 (S.D.N.Y. July 3, 1975). See also *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 811 (2d Cir. 1975).

of the Exchange Act, and Rule 10b–5 promulgated thereunder.

*Marlane Kleinman.*

The same considerations as applied to Sharpe and Guttman are present with respect to Marlane Kleinman. She also was in a position to know of the fraudulent scheme and should have known, in the exercise of reasonable care, that her actions of opening an account under a different name, at a different broker, and in entering the Beneficial trading market, would aid in its success. We conclude, therefore, that Marlane Kleinman violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 promulgated thereunder.

## INJUNCTIVE RELIEF

Plaintiff seeks broad injunctive relief against Commonwealth, Drucker, Kleinman, DK & B, Sharpe, Guttman and Marlane Kleinman. Defendants claim that injunctive relief is unnecessary since neither Commonwealth nor DK & B is operational and since the individuals are no longer involved in the securities business.

■ The SEC, however, "appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." [22] The crucial test is whether "there is a reasonable likelihood that the wrong will be repeated." [23] And whether this inference should be drawn depends on the totality of the circumstances. [24]

A recent case delineated a number of circumstances to be considered, including:

"the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." [25] (Citations omitted.)

■ We note, in particular, the repeated and persistent violations committed by Drucker, Kleinman, Commonwealth and DK & B. Also, Drucker still receives $500 per month as a "consultant" to Beneficial (whose president is Drucker's brother-in-law). Kleinman not only declined to testify on his own behalf but neglected even to attend the trial of this case. [26]

Taking all of the circumstances into account, we find that there is a reasonable likelihood that Drucker, Kleinman and the two corporations under their control, Commonwealth and DK & B, will continue to violate the securities laws. Permanent injunctive relief is, therefore, warranted. Furthermore, we conclude that the public interest can best be protected if the injunction extends not only to Beneficial securities but to any other securities as well.

"The effect of such restraints on their business activities is clearly outweighed by the public interest involved in maintaining a fair and hon-

**22.** *SEC v. Management Dynamics, Inc., supra,* 515 F.2d at 808.

**23.** *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972).

**24.** *SEC v. Management Dynamics, Inc., supra,* 515 F.2d at 807.

**25.** *SEC v. Universal Major Indus. Corp.,* CCH Fed.Sec.L.Rep. [Current] ¶ 95,229, at 98,214 (S.D.N.Y. July 14, 1975).

**26.** Marlane Kleinman also declined to appear at the trial. It has been held that a defendant's failure to testify in a case such as this warrants the inference that the testimony would have been unfavorable. See *N. Sims Organ & Co. v. SEC,* 293 F.2d 78, 80–81 (2d Cir. 1961), *cert. denied,* 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); *SEC v. D'Onifrio,* CCH Fed.Sec.L.Rep. [Current] ¶ 95,201, at 98,-018 (S.D.N.Y. June 3, 1975); *SEC v. Kelly Andrews & Bradley, Inc.,* 341 F.Supp. 1201, 1205 (S.D.N.Y.1972).

est securities market and in sustaining public confidence in that market."[27]

Similar considerations apply to Sharpe, Guttman and Marlane Kleinman. They were not innocent bystanders but insiders who attempted to exploit the illegal activities of Drucker and Kleinman for their own gain, thus lending assistance to the unlawful plan. We see no reason to believe that, should a similar opportunity arise in the future, they would shy away. We conclude, therefore, taking all relevant factors into account, that a permanent injunction covering Beneficial and any other securities should be entered against Sharpe, Guttman and Marlane Kleinman.

## ANCILLARY RELIEF

Lastly, plaintiff seeks ancillary relief in the form of a disgorgement of profits. It is well settled that once equity jurisdiction is invoked by a showing of violations of the securities laws, the court may order a disgorgement of profits.[28]

"Clearly, it would defeat the purpose of the securities laws if an individual who violated Section 10(b) and Rule 10b–5 were allowed to keep the profits arising from the violation. Thus, effective enforcement of the law requires that the S.E.C. be able to make violations unprofitable by making violators disgorge their profits."[29]

We conclude that in this case such relief is clearly warranted against each defendant.

Defendants claim that any profits they may have realized have been wiped out by the drastic fall in the public trading price, resulting from the SEC's suspension of trading in Beneficial securities. It is asserted, therefore, that there are no profits to be disgorged.

Defendants neglect to mention, however, that the Beneficial suspension occurred because of their own wrongdoing. To allow them to credit their subsequent losses against their prior gains would be to permit them to profit from their own wrongs.

We conclude, therefore, that Commonwealth, Drucker, Kleinman, DK & B, Sharpe, Guttman and Marlane Kleinman must disgorge all actual profits realized on the purchase and sale of Beneficial securities from December 20, 1971 to the close of business on March 2, 1973, the last trading date prior to the suspension. The amount of such profits shall be paid by them to an escrow agent, to be appointed by the court. The escrow agent shall use his best efforts to locate those members of the public who invested in Beneficial securities between December 20, 1971 and March 2, 1973 and, out of the sums deposited with him, pay each such person an amount to be determined by him to be equitable and fair.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52, Fed. R.Civ.P.

Settle an order and judgment, within twenty (20) days of the date of this opinion, accompanied by a memorandum supporting the computation of the amount to be disgorged by each defendant.

---

27. *SEC v. Shapiro*, 349 F.Supp. 46, 55 (S.D.N.Y.1972), *aff'd*, 494 F.2d 1301 (2d Cir. 1974).

28. See *SEC v. Shapiro, supra*, 349 F.Supp. at 55; *SEC v. Manor Nursing Centers, Inc.*,

*supra*, 458 F.2d at 1103; *SEC v. Golconda Mining Co.*, 327 F.Supp. 257, 259 (S.D.N.Y. 1971).

29. *SEC v. Shapiro, supra*, 349 F.Supp., at 55.