## In re OLYMPIA BREWING COMPANY SECURITIES LITIGATION.

### No. 77 C 1206.

United States District Court,
N.D. Illinois, E.D.

Jan. 30, 1985.

Richard J. Phelan, John M. Christian, Michael A. Pope, Phelan, Pope & John, Joseph A. Ginsburg, Levin, Ginsburg & Novoselsky, Chicago, Ill., for plaintiff.

William E. Snyder, Thomas W. Johnston, Chadwell & Kayser, Ltd., Chicago, Ill., Andrew C. Freedman, Reavis & McGrath, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under the federal securities laws is before the court on the motions for summary judgment and dismissal for want of prosecution of defendants Robert Wilson and Robert Wilson Associates (the "Wilson defendants"). In plaintiffs'[1] Amended Complaint of February 12, 1981, the Wilson defendants are charged in one count with violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as rules promulgated thereunder. For the reasons stated below, both motions are granted.

Plaintiffs allege that sometime before December 31, 1976, the Wilson defendants and "other co-conspirators" began to sell "short" shares of the common stock of Olympia Brewing Company ("Olympia"). According to plaintiffs:

> Defendant short sellers and other co-conspirators devised and engaged in a secret scheme or conspiracy to manipulate the price of the shares of Olympia. They willfully and consciously acted individually and in concert with each other to effect a pattern of short sales of shares of Olympia with the intent, purpose and effect of depressing the price of such securities and for the purpose of inducing the sale of Olympia stock by others.

(Amended Complaint ¶ 12.) As part of the manipulation, the Wilson defendants and their alleged co-conspirators, on or after August 15, 1976, agreed to select Olympia stock as a target for short-selling "manipulation;" engaged in short selling such that on March 4, 1977, about 150,000 shares had been shorted; effected short sales at the end of trading days to depress "artificially" the price of the shares; "intentionally utilized short selling in order to discourage institutional investors from purchasing Olympia shares;" used short sales to force margin calls, thereby inducing more sales; and effected "naked" short selling. (Amended Complaint ¶ 16(a–f).) As a result of the short selling, the price of Olympia allegedly:

> declined precipitously from 60¼ on March 4, 1977, to 31¾ on March 11, 1977. The price of such shares fell eleven points on March 7, 1977, and 16¾ points on March 11, 1977. Trading in Olympia shares was suspended by the Securities and Exchange Commission between the period beginning on or about March 15 and ending on or about March 25, 1977.

(Amended Complaint ¶ 17.) This scheme to depress the market price of Olympia was concealed from plaintiffs, who relied on the integrity of the market when they purchased Olympia shares. (*Id.* at ¶ 18.) Hilda Mangel, for example, is the sole beneficiary of a trust that purchased 900 shares of Olympia on September 16, 1976 and 1,875 shares of Lone Star Brewing Company on December 31, 1976. On March 7, 1977, the Trustee sold 100 of these shares. Wendell W. Mew was an owner of 5,000 shares of Lone Star Brewing Company, purchased at some undisclosed time and sold at a loss sometime after March 7, 1977. According to plaintiffs, the scheme to depress artificially the price of Olympia constituted a "device, scheme or artifice to defraud and an act, practice or course of business which operated as a fraud or de-

---

**1.** Two plaintiffs, Wendell Mew and Hilda Mangel, filed this action on July 15, 1977. Only Hilda Mangel remained as a plaintiff after the court granted Wendell Mew's motion to withdraw on April 26, 1983. For convenience, however, the court will refer to "plaintiffs" throughout the memorandum.

ceit in connection with the short sales of the securities of Olympia." (*Id.* at ¶ 19.)

## SUMMARY JUDGMENT

The Wilson defendants have moved for summary judgment, arguing that the facts demonstrate that no unlawful scheme to depress the price of Olympia shares took place. Plaintiffs submit evidence tending to show the existence of substantial short positions in Olympia and the correlation between an article unfavorable to Olympia and trading by the Wilson defendants. Unfortunately, neither party discusses the law applicable to a market manipulation claim. Before examining the evidence, therefore, the court must set forth what it understands to be plaintiffs' legal theory in this case.

### A. Market Manipulation

Section 10(b) proscribes the use of "any manipulative or deceptive device or contrivance in contravention of the rules and regulations [of the SEC]" employed in the purchase or sale of designated securities. Rule 10b–5, promulgated under this provision, details certain prohibited deceptive practices.

Section 17(a) of the 1933 Act makes it unlawful, in the offer or sale of designated securities:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money ... by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

■ Section 10(b) targets "manipulative or deceptive" conduct, and thus all of the activities of Rule 10b–5, to be unlawful, must be accompanied by *scienter.* See *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977). However, if an implied claim exists under § 17(a), it is possible that scienter is not required under § 17(a)(2) & (3). L. Loss, *Fundamentals of Securities Regulation* 1150 (1983 & Supp.1984). Otherwise, the elements of § 17(a) and Rule 10b–5 are substantially the same as applied to sellers. Because of the court's ruling, it need not determine whether an implied claim exists under § 17(a).

It is clear from the Amended Complaint and the plaintiffs' August 8, 1984 memorandum, that plaintiffs are seeking to establish market manipulation. Plaintiffs' injuries stem from their purchase at a price that subsequently declined as a result of manipulative activities such as end-of-the-day trading and "naked" sales by the Wilson defendants. It is thus important to determine the types of acts that would constitute actionable manipulation.[2]

The Supreme Court has indicated that manipulation normally refers to "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe,* 430 U.S. at 476, 97 S.Ct. at 1302. One district court indicated that manipulation claims should be limited to the type of activity that "creates the false impression that certain market activi-

---

**2.** In *McNichols v. Loeb Rhoades & Co., Inc.,* 97 F.R.D. 331, 336 (N.D.Ill.1982), the court left open whether market manipulation may state a claim under § 10(b). Several district courts have held that allegations of fraud on the market may state a claim under § 10(b), including a court in this district. *Grossman v. Waste Management, Inc.,* 589 F.Supp. 395, 402 (N.D.Ill. 1984). And, while the Seventh Circuit has yet to rule on this issue, the Second, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits have ruled that market manipulation may state a claim under the federal securities laws. *See cases cited in Lipton v. Documation, Inc.,* 734 F.2d 740, 743 (11th Cir.), *petition for cert. denied* 10/22/84, —— U.S. ——, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985). The court agrees with these courts that market fraud is actionable under § 10(b). For purposes of this motion, the court assumes the validity of this theory under § 17(a) of the 1933 Act.

ty is occurring when in fact such activity is unrelated to the actual supply and demand." *Hundahl v. United Benefit Life Insurance Co.*, 465 F.Supp. 1349, 1360 (N.D.Tex.1979). This conclusion, derived from the language quoted above in *Santa Fe*, persuaded the *Hundahl* court that misrepresentations about the value of the issuing corporation could not constitute market manipulation. The court also relied on common law market manipulation cases which involved market transactions tending to prevent the market price from "accurately reflecting the market's unimpeded judgment of the stock's value." 465 F.Supp. at 1360.

Several market manipulation cases involve such trading activities, unrelated to supply and demand, that tend to inflate or depress the market price. For example, in *Securities & Exchange Commission v. Commonwealth Chemical Securities, Inc.*, 410 F.Supp. 1002 (S.D.N.Y.1976), *aff'd in part, modified in part, and remanded*, 574 F.2d 90 (2d Cir.1978), trading between accounts and "swap" trading were held to introduce a "foreign element ... to those which normally establish the price of a particular stock, namely, supply and demand in a public auction market, free from artificial manipulation, and the performance of the issuing company in a system of free competitive enterprise." 410 F.Supp. at 1310. *See Koenig v. Smith*, 88 F.R.D. 604, 605–06 (E.D.N.Y.1980) (greatly increased trading activity allegedly artificially inflated price; financial performance of issuing corporation did not justify price increase).

Manipulation through deceptive trading activities is an element of plaintiffs' claims against Loeb Rhoades & Co., Inc. in this consolidated action. The activities alleged in the claims against Loeb Rhoades & Co., Inc. are detailed in this court's opinion in *McNichols v. Loeb Rhoades & Co., Inc.*, 97 F.R.D. 331, 333 (N.D.Ill.1982) (adds element of misrepresentations as to imminent acquisition of issuing corporation). The deceptive trading activities in the case against the Wilson defendants include "naked" short selling, the taking of sub-

stantial short positions, and end-of-the-day trading designed to depress artificially Olympia's price.

Other cases have allowed misrepresentations concerning the issuing company's financial performance to support claims of market manipulation. For example, Judge Patrick E. Higgenbotham, in *In re LTV Securities Litigation*, 88 F.R.D. 134 (N.D. Tex.1980) (author of *Hundahl*), discussed the theory of market manipulation as applicable to the overvaluation of the issuing corporation's inventories in a statement of earnings. Another court has explicitly held that manipulation is not limited to the types of activities listed in *Sante Fe*. *Jordan v. Global Natural Resources*, 564 F.Supp. 59, 66 (S.D.Ohio 1983). There, the court noted the Supreme Court's definition of manipulative as connoting "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). Artificial effects are produced by activities not reflecting the "basic forces" or "natural forces" of supply and demand. 564 F.Supp. at 66. Thus, the *Jordan* court found that public misrepresentations concerning the value of the issuing corporation and its proposed transactions could state a claim for manipulation. *Id.* *See also Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 170 (E.D.Pa.1979) (manipulation alleged through both deceptive market transactions and false market reports); *Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir.1981), *vacated as moot*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982) (inaccurate financial report of issuing corporation); *McNichols v. Loeb Rhoades & Co., Inc.*, *supra*, (false acquisition rumors); *Mottoros v. Abrams*, 524 F.Supp. 254, 256–57 (N.D.Ill.1981) (misrepresentations in press releases as to issuer's sales). In this case, the only representation concerning the value of Olympia Brewing Company mentioned in plaintiff's memorandum is the March 7, 1977 publication in *Barron's* of facts reflecting negatively on Olympia.

■ Regardless of whether market manipulation is achieved through deceptive trading activities or deceptive statements as to the issuing corporation's value, it is clear that the essential element of the claim is that *inaccurate* information is being injected into the marketplace. *Panzirer*, 663 F.2d at 368. *See also Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *T.J. Raney & Sons v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330, 1332 (10th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984) ("[m]aterial misrepresentation will theoretically cause the artificial inflation or deflation of the stock price"). The market price therefore reflects false information, and deceives the purchaser or seller relying on the market price as a true indicator of the issuer's worth. Hence, in *Billard v. Rockwell International Corp.*, 683 F.2d 51, 56 (2d Cir. 1982), the Court found no deception in the announcement of a genuine tender offer, explaining that, "[n]o potential trader is led to believe there is a ready market for shares when none in fact exists and the activity of the offeror is not designed to achieve anything other than the success of the [tender] offer." Under this logic, therefore, injection of accurate information into the market price, while perhaps unlawful under other securities laws such as those pertaining to insider trading, cannot state a claim for market manipulation.

Before addressing the facts set forth by Wilson in support of their motion, the court notes that neither party explains to the court the propriety of the various market practices pursued by Wilson. The court makes the following assumptions: Short selling is an entirely proper procedure when backed by a sufficient number of borrowed shares. In addition, fluctuations in the market price of stock resulting from legitimate trading activities is a natural and lawful result of such activities. For example, if traders determine that a stock is overpriced and substantial selling occurs, the resulting decline in price is not unlawful. Substantial trading, either long or short, is not by itself unlawful. Finally, borrowing shares from and selling short to the same entity is not unlawful.

The Wilson defendants argue that their activities in purchasing shares of Olympia were not manipulative and hence cannot support a claim for securities fraud. Robert Wilson is an unlicensed professional investor and the sole general partner of Robert Wilson Associates, an investment partnership. (Wilson Dep., 1/27/83, p. 3.) Wilson made trades on behalf of Robert Wilson Associates in Olympia on several occasions. (*Id.* at 6.) Indeed, accepting plaintiffs' Exhibit C as an accurate reflection of Wilson's trades in Olympia, Wilson made substantial short sales in Olympia from August 25, 1976 through March 11, 1977. These sales of Olympia were in amounts of as low as 100 shares and as high as 10,000 shares. On March 11, 1977, Wilson had sold 44,433 shares of Olympia short, 4,533 of those shares having been converted from 17,000 shares of Lone Star Brewing Company purchased on January 3 and 4, 1977.

According to Wilson, in 1976, he made a decision to increase his short positions in Olympia stock. (Wilson Dep. at 28.) Wilson candidly states that once he made that decision, he made all possible efforts to borrow as much Olympia shares as was within his means in order to pursue his strategy of short selling. For example, Wilson explains that, "I just want to underscore that I had constant discussions with [my broker Neuberger and Berman] trying to find more stock to borrow.... I should add, it is fair to say that I wanted to short all that I thought [my brokers] were likely to be able to borrow." (Wilson Dep. at 36–37.) Wilson notes, however, that he probably would not have sold short more than 100,000 shares. (*Id.* at 37.)

■ Wilson consistently states that his reasons for desiring to sell Olympia short stemmed from his own analysis of Olympia stock in August 1976. (Wilson Dep. at 37, 53–54, 63–64.) Wilson's opinion was that while other brewery stocks were "going

down," Olympia was rising. He also indicated that the Lone Star acquisition was, in his mind, a negative factor in evaluating the worth of Olympia shares. According to Wilson, Olympia's price was "high" in comparison with the company's "fundamentals." Hence, because Olympia was "overpriced," it was an attractive stock to sell short. Indeed, Wilson surmised that Olympia's price was being "rigged." (*Id.* at 53.) This opinion was formed by his market analysis of Olympia, as well as by the difficulty he had in borrowing shares from Loeb Rhoades. (*Id.* at 54.) (There is testimony that Wilson once accused Loeb Rhoades of manipulating Olympia.) Wilson, moreover, sold shares short only when he was able to borrow shares. (*Id.* at 11, 30, 57–64.) This evidence, unchallenged by plaintiffs, refutes the charge that the Wilson defendants were engaged in "naked" short selling.

Wilson admittedly had dinner with Alan Abelson, a columnist at *Barron's*, sometime in the beginning of 1977. (Wilson Dep. at 50, 55.) Wilson has known Abelson since 1967 or 1968. (*Id.* at 5.) Alan Abelson remembers the dinner as occurring in February 1977. (Abelson Dep. at 19.) According to Abelson, Wilson made a passing reference to Olympia, saying it was "the biggest rig he ever saw." Abelson relates that he made no comment about that, and that that was the "sum total" of the discussion. (*Id.* at 1920.) Abelson does not remember Wilson commenting that he hoped Abelson would conduct an investigation regarding Olympia. (*Id.* at 32.) According to Abelson, he did nothing about writing an article until other persons, unrelated to Wilson, provided the inspiration to do so. (*Id.* at 9, 12, 21.)

Wilson confirms that he mentioned his thoughts about Olympia being "rigged" to Abelson during this dinner meeting. He further remembers stating that an investigation ought to be conducted by *Barron's* into the stock. (Wilson Dep. at 53.) Wilson told Abelson that his evaluation of the stock indicated it was overpriced. This, plus the difficulty he had in borrowing the stock from Loeb Rhoades, supported his

position that the stock was rigged. (*Id.* at 53–54.) According to Wilson, Abelson did not respond to this information. (*Id.* at 53.) Wilson did not tell Abelson about the takeover rumors concerning Olympia, to which he gave no credence, and had no further discussions with Abelson on this subject. (*Id.* at 54–55.)

On March 7, 1977, Abelson published his opinion that Olympia shares were performing spectacularly in relation to the shares of other brewing companies. In his opinion, the positive events in Olympia's past year could not account for its high price. Abelson further reported that an Olympia spokesperson stated that Olympia was not for sale, despite rumors of an impending takeover. (*See* Wilson Memorandum, filed 7/7/83, Exhibit 1.) Wilson apparently had no conversations with Abelson concerning Olympia apart from this dinner conversation, and hence was not aware of the impending publication of the *Barron's* article.

Wilson's trading activity in Olympia is fairly consistent throughout the period from August 1976 through March 1977. From August 1976 through December 1, 1976, Wilson sold short 29,900 shares of Olympia, at prices ranging from 38 to 36 from August 25 to September 2, 1976, and from 45½ to 45⅛ from November 5 to December 1, 1976. These 29,900 shares were sold on fifteen different days, with one day's sale consisting of 10,000 shares and the other sales ranging from 100 to 4,500 shares. In the beginning of January 1977, on two days, Wilson sold 17,000 shares of Lone Star. From March 3 to March 7, 1977, Wilson sold 6,000 shares of Olympia at prices ranging from 60½ to 61¼. Finally, on March 11, 1977, the next trading day after the *Barron's* article appeared, Wilson sold 3,000 shares of Olympia at prices ranging from 44 to 47⅞.

This trading is consistent with Wilson's analysis that the shares were overpriced as early as August 1976, when they were priced in the high 30s, as even after the *Barron's* article, Wilson continued to sell short. Wilson's acts throughout this peri-

od confirm his testimony that he sold as much Olympia as his brokers could borrow.

According to Wilson, these facts are entirely exculpatory. He explains that the evidence demonstrates that he properly sold shares short based on his analysis that the shares were overpriced. He did not sell shares that he had not already borrowed. Moreover, he did not inject inaccurate information concerning Olympia into the marketplace. At this point, it is appropriate to note that plaintiffs never once dispute Wilson's assertion that Olympia was overpriced, or otherwise attempt to show that the price at which they purchased represented the true market value of Olympia. Plaintiffs never contest, in evidence, argument, or allegation, the accuracy of the Abelson article. The only evidence of Olympia's value before the court, therefore, comes from Wilson, who basically contends that the shares were not worth the asking price at all times during his short sales.

■ Because of this factual record, therefore, the court grants Wilson's motion for summary judgment to the extent the plaintiffs might be claiming that Wilson or his "co-conspirators" injected inaccurate information about Olympia's market value into the marketplace. Wilson's belief and the *Barron's* article, on this record, were accurate and could not therefore be responsible for having the effect of *artificially* changing the price of Olympia. If anything, the information concerning the overpricing was a service to the market, as it injected information into the market tending to indicate that Olympia shares were overpriced when this was in fact the case. (The court will address possible unlawful insider trading, an entirely separate violation, below.)

■ The court finds that the Wilson defendants have adduced sufficient evidence of their lawful behavior to shift the burden under Rule 56 to plaintiffs. *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir.1984). That evidence has provided a lawful and reasonable explanation for trading activities allegedly part of

a massive market manipulation scheme. Wilson's testimony credibly and candidly sets forth his analysis of Olympia stock and his decision to sell short as many shares as he could borrow. His testimony is consistent with the record of his trades in Olympia, indicating consistent selling at times when he was able to borrow the shares. Each trade was motivated by a lawful, economically-based decision that Olympia was overpriced or even rigged. He acted on his own market evaluations and not in concert with other short sellers. Any effect on the market price of his selling based on his evaluation that the price would decline is not improper.

On this showing, plaintiffs now have the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Resting on allegations or the hope of impeaching defendants' evidence does not satisfy this burden. It should be noted, moreover, that this case was filed in 1977, and a considerable amount of discovery has taken place in the set of cases eventually consolidated with this one under Civil Action 77 C 1206. Moreover, plaintiffs responded to this motion shortly before the case was set for trial and well after discovery was closed. Plaintiffs apparently have provided the court with all of their evidence in support of their downward manipulation scheme, and have made no request under Rule 56(f) for further discovery.

Most of plaintiffs' evidence requires the court to draw inferences of an unlawful conspiracy. On this motion, the court must draw all inferences in favor of the nonmoving party, although only reasonable inferences are indulged. *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir. 1984); *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984). Where the nonmoving party is seeking to show the existence of a conspiracy solely through circumstantial evidence, the court has even less discretion in the types of inferences that can defeat a motion for summary judgment.

In *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457 (7th

Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982), plaintiffs sought to show an unlawful price-fixing conspiracy. Defendants had denied the existence of the agreement, and plaintiffs pointed to parallel activities by defendants as indicative of unlawful agreement. The Court explained:

> [Plaintiffs suggest] that while parallel pricing alone is not sufficient to establish a price-fixing conspiracy, such evidence together with an opportunity to conspire is sufficient to rebut defendants' denials and require a trial on the merits. [Citations and footnote omitted.] However, when the plaintiff or prosecution relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference.

*Id.* at 463. In granting defendants' motion for summary judgment, the *Weit* Court noted:

> When a District Court has afforded the parties eight years of unlimited discovery, the parties have designated the evidence on which they will rely at trial, and the Court has had an opportunity to review the evidence and concludes that no reasonable jury could return a verdict for plaintiffs, judicial economy mandates that summary judgment be entered. [Citation omitted.] A trial on such claims would serve only as a forum for impeachment and argument by counsel; not for the presentation of evidence.

*Id.* at 464. *See also O'Byrne v. Cheker Oil Co.,* 727 F.2d 159, 163 (7th Cir.1984) (summary judgment granted defendants in antitrust case as no "significant probative evidence" supported complaint and plaintiffs' evidence "not susceptible" to their interpretation). A review of the record shows that plaintiffs' evidence does not support a compelling inference of conspiracy.

### 1. "Naked" Short Selling

■ Wilson has testified that his sales were covered by borrowed shares and that he sold Olympia only when he was able to borrow a sufficient number of shares. This evidence remains uncontradicted. Further, there is no evidence of other short sellers who employed this practice, much less any connection between these alleged sellers and Wilson.

### 2. Wilson's Conspiratorial Acts

■ While issues of intent should not normally be resolved on summary judgment, the court notes that evidence of the Wilson defendants' participation in or even knowledge of the alleged conspiracy is patently inadequate. Plaintiffs point to Wilson's deposition, in which he was asked whether he knew of other short sellers in Olympia over the relevant time period. Wilson mentions the name Cumberland Associates, stating, "I heard they had a short position, I didn't know whether that was accurate or not. I did not hear it from them." (Wilson Dep. pp. 78–79.) Plaintiffs apparently have not conducted any discovery related to Cumberland Associates, as no evidence of whether they did have a short position and, if so, the extent of that position, is provided. This largely hearsay evidence may be used only to reflect Wilson's state of knowledge of other short sellers. It certainly does not point to the existence of a conspiracy.

The only other evidence concerning Wilson's alleged participation in this conspiracy is his practice of sending a quarterly list of his stock positions to other brokers. Wilson testified that he regularly sends such a list to elicit judgments by other brokers concerning his investment decisions. Plaintiffs do not contend that the practice is unlawful, but argue that it is evidence of his intent to manipulate the market by encouraging others to sell Olympia. First, the court notes again that this practice is innocent on its face. Second, plaintiffs present no evidence, and apparently have made no effort to determine, that the list had any effect on Olympia sales. Third, sharing market information, even to encourage similar trading by others, is a lawful means of distributing information.

The court will not entertain the inference plaintiffs wish to draw, namely, that the recipients of the list understood that Olympia should be sold as part of a concerted effort artificially to depress its price; that the recipients did so; and that the effect of the concerted activity caused Olympia to drop 30 points in a matter of days. It is disconcerting that not only did plaintiffs not conduct any discovery concerning this list, but that the date of the list, its contents, and indeed any other information about it is not provided to the court. Probably, plaintiffs have not even seen the list as they were not present at Wilson's deposition.

### 3. Existence of Other Short Sellers or of Massive Short Selling

■ Plaintiffs allege that at least 150,000 short positions were taken in Olympia before the complained-of price decline in March 1977. At this juncture, the court points out that plaintiffs nowhere inform the court of the actual number of outstanding Olympia shares. There is no testimony as to how short selling could cause a 50% price decline in the shares of an actively traded public corporation. Furthermore, the court reminds plaintiffs that short selling is simply not unlawful, even in large numbers and even if the trading does negatively affect the purchase price. Where the trading volume and price simply reflect supply and demand based on accurate market information, this is lawful market behavior, not market manipulation. Hence, evidence of substantial short selling is necessary to plaintiffs' claims, but certainly does not prove them. Where the selling appears in all other respects to be lawful, the court will not draw the inference that an unlawful conspiracy to manipulate the market price took place.

The court agrees with the Wilson defendants that plaintiffs' evidence on the number of short positions in Olympia is largely hearsay, irrelevant, or incompetent. The proposed evidence is derived from persons at one time affiliated with Loeb Rhoades & Co. It should be stated at the outset that

where these persons identify the existence of short selling by Wilson's brokers, Neuberger and Berman, the evidence is cumulative; Wilson has readily testified that he sold short in Olympia.

Plaintiffs rely heavily on the testimony of Jon Hedrich, one-time head of the Loeb Rhoades block trading department in Chicago, to establish their claim that at least 150,000 shares of Olympia were sold short during the relevant period. First, Hedrich infers that dealers other than Neuberger and Berman were attempting to sell Olympia short. On further examination, however, it becomes clear that Hedrich obtained this information from George Kowski, a Loeb Rhoades market maker in Olympia.

An examination of Kowski's testimony reveals that he thought Neuberger and Berman were selling Olympia short. He could not remember any other firms selling short as, if they existed, "they were not in sufficient amounts where I could really remember." (Kowski SEC Dep. at 177.) Kowski said that he "could have heard" rumors about 200,000 short positions in Olympia. (*Id.* at 178.) This is not admissible to show that such positions existed.

Returning to Hedrich's testimony, Hedrich stated that "hundreds of thousands" of shares were offered to Loeb Rhoades in a manner suggesting short selling. (Hedrich SEC Dep. at 211.) The following exchange occurred at Hedrich's SEC deposition:

Q. Do you know the approximate size of the short position?

A. No. I have no way of knowing.

Q. Did anyone make any approximation to you of what the size of the short position was?

A. There was conjecture that it was in the neighborhood of low to mid six figures.

Q. Two to five hundred [thousand] shares?

A. That would be accurate.

(*Id.* at 220.) This is consistent with his civil deposition testimony. Hedrich was asked, "How often was there short selling," and

responded, "I would have no way of knowing. My knowledge of it, or our firm's knowledge of it, seemed sporadic. But I would have no way of knowing of short selling that was going on that we were not aware of." (Hedrich Dep. at 422.)

The court finds Hedrich's guess of two to five hundred thousand short sales inadmissible hearsay. Since this is the basis for his statements in his later, civil deposition, those statements are also hearsay. As to the statement that "hundreds of thousands" of short trades were executed, this must also have been based on hearsay conjecture, as Hedrich clearly indicates he had "no way of knowing" these numbers. Plaintiffs, moreover, make no effort to establish Hedrich's competence to testify to these matters. In light of Hedrich's own admissions of incompetence, the court should be told something about Hedrich's expertise and his opportunities to observe trading in Olympia. Instead, the court is provided random pages of an obviously much longer deposition, with no information on Hedrich's qualifications to testify to these matters. His testimony on the number of short sales is therefore both hearsay and incompetent. Finally, Hedrich's testimony is irrelevant, since it does not refer clearly to the dates of the alleged sales. Those dates are crucial to an analysis of how the short sales effected the price decline of March 1977. As will be discussed below, at least concerning the Wilson defendants' trades, Olympia's price rose during the bulk of the short selling. The court therefore has no evidence of the massive amount of short selling that allegedly engendered the March 1977 price decline. All evidence of sales other than that of the Wilson defendants' approximately 44,000 sales is inadmissible.

Plaintiffs finally point to testimony tending to suggest that Neuberger and Berman were borrowing Olympia shares from Loeb Rhoades. This evidence does not point to any wrongdoing. The amounts of borrowing, a high figure being 30,000 shares, are consistent with the existence of sales only by the Wilson defendants.

Plaintiffs' evidence concerning the existence of massive short sales, numbers of short selling firms, and substantial borrowing, is either inadmissible or does not support the inference of conspiracy.

### 4. Use of Short Sales to Discourage Institutional Investment and Force Margin Calls

Plaintiffs present no evidence on this allegation.

### 5. Artificial Depression of Price of Olympia

█ Plaintiffs point to two types of activities that allegedly caused the March 1977 decline. First, they rely on Loeb Rhoades traders' comments that short selling could and in some cases did depress Olympia's price. Jon Hedrich testified that short sellers often attempted to sell a large block of shares which, if not accepted, would be taken to another broker with a possible resulting price decline. In constructing several hypothetical examples of such practices, not claimed to be unlawful, Hedrich qualified his testimony with, "I'm not aware that anything like this ever occurred." (Hedrich Dep. at 442.) Later in Hedrich's deposition, the questioner refers to Hedrich's hypothetical examples as illustrations of "activities that you were being told were occurring." (Id. at 443.) Hedrich's deposition is quite unclear at any point as to whether he is referring to a hypothetical example, a hearsay statement, or his own knowledge. His previous SEC testimony, the court has already noted, was based largely on hearsay.

Assuming that short sellers were able to get a lower price for their shares, however, there is no connection between this trading and the March 1977 price decline. The following testimony occurred in Hedrich's deposition:

Q. Was there any impact on the price of the stock during the period of time from the early fall of '76 through the "Barron's" article?

A. Sometimes.

Q. What was the impact?

A. It varied.

Q. Did the stock price ever drop as a result of short selling?

A. Sometimes.

Q. Do you recall the price at which the stock was when it dropped?

A. Not exactly.

. . . .

Generally, mid-30's to mid-50's.

(Hedrich Dep. at 423.) Hedrich later testified that the stock dropped several times during the relevant period. His testimony never makes clear whether the declines in question included the drastic March 1977 decline, a decline from the low-60's. Indeed, his testimony supports an interpretation that he is not referring to the decline by which plaintiffs were injured. He cannot be sure whether any decline was more than temporary and seeks to give examples "in terms of the incremental drops that occurred." (*Id.* at 424.)

Kowski believed that short selling may have depressed the stock "once or twice." (Kowski SEC Dep. at 170.) Again, his inability to remember these depressions supports the court's interpretation of the evidence as not referring to the March 1977 decline. Rather, Hedrich's and Kowski's testimony at most supports an inference that selling may have had a downward effect on Olympia's price at certain times. No support for the proposition that short selling contributed to the March 1977 decline can be derived from Hedrich's and Kowski's testimony.

The court notes that the record of the Wilson defendants' trades flies in the face of plaintiffs' conjectures about the effects of the short selling. The Wilson trades constitute the sum of the evidence on short selling. Yet, during the sale of the first 36,000 shares by the Wilson defendants, Olympia's price was roughly stable or went up. At any given period of consistent trading in Olympia by the Wilson defendants, the price did not change by more than two points. The sale of 6,000 shares from March 3 to March 7, 1977 occurred with the price fluctuating between 60½ to 60¼. It

is implausible that Wilson's last 3,000 out of 43,533 sales contributed in any significant way to the alleged 16¾ point decline on March 11, 1977.

Plaintiffs have not produced any competent or plausible evidence that Wilson's market activities contributed in any substantial way to the March 1977 decline causing plaintiff's injury. At least this much must be established before the court may draw the next inference, that is, that the sales were somehow unlawful.

 The second factor plaintiffs contend is responsible for the March 1977 decline is the March 7, 1977 *Barron's* article. The court has already noted, however, that Wilson believed that article was accurate and consistent with his own market evaluation of Olympia. Plaintiffs never claim the article was inaccurate. They admit that Wilson believed Olympia was overpriced. (Plaintiffs' Memorandum, filed 8/8/84, p. 31, n. 22.) Hence, even assuming that Wilson knew that such an article would appear, the article is not responsible for an *artificial* decline in Olympia's price. The court has already pointed out that the essence of market manipulation is the injection of inaccurate facts into the market.

As explained above, the evidence establishes a lawful and reasonable interpretation of the Wilson defendants' series of trades. Plaintiffs' evidence is far from that necessary to support a compelling inference that a broad, market manipulation conspiracy existed. Summary judgment in favor of defendants is therefore granted on the allegations of market manipulation.

**B. Insider Trading**

 Plaintiffs have not attempted to state a claim against the Wilson defendants based on insider trading. However, the court examines the possibility of stating such a claim, since plaintiffs contend that Wilson traded on knowledge of the impending *Barron's* publication. (The court has already held that this sort of trading, if it occurred, could not state a claim for market manipulation.) The evidence demon-

strates that Wilson mentioned to Abelson that Olympia was overpriced, even rigged. Abelson states that he did not act on this comment, but was later motivated by others to investigate Olympia and write the March 7, 1977 article in *Barron's*. Plaintiffs attach exhibits tending to show that Wilson believed Abelson would act on his information. Wilson sold some shares of Olympia shortly before the article was published.

If this activity is unlawful insider trading and caused plaintiffs' injury, summary judgment could not be entered against plaintiffs. The current case law suggests that this activity may not constitute insider trading, as no information was derived from any fiduciary. *See Chiarella v. United States*, 445 U.S. 222, 229–32, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980); *Dirks v. Securities and Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). However, the SEC apparently interprets insider trading as including knowledge of an impending publication. *See* Wall Street Journal, Jan. 21, 1985, at 7, col. 2.

The court need not decide whether Wilson's sales were motivated by improper insider information, however, as plaintiffs could not have been injured thereby. Plaintiffs do not state the dates of all of their various purchases, but it is clear that their last purchase was on December 31, 1976. (Amended Complaint ¶ 4.) Wilson's dinner with Abelson was not until February 1977. At the earliest, only sales by the Wilson defendants *after* the dinner could be considered the product of a fraudulent scheme. Hence, plaintiffs have no standing to complain of insider trading.

### DISMISSAL FOR WANT OF PROSECUTION

■ Defendants also move to dismiss this action with prejudice under Fed.R. Civ.P. 41(b) "[f]or failure of the plaintiff to prosecute...." Dismissal under Rule 41(b) is within the trial court's discretion and will not be disturbed on appeal absent abuse of discretion. *Locascio v. Teletype Corporation*, 694 F.2d 497, 499 (7th Cir. 1982), *cert. denied*, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 808 (1983) (courts of appeals will "not set aside a ... discretionary order unless it is clear that no reasonable person could concur in the trial court's assessment of the issue under consideration").

Because the sanction of dismissal, especially with prejudice, is a severe one, the exercise of discretion to dismiss is limited by a number of considerations. *Nealey v. Transportacion Maritima Mexicana, S.A.*, 662 F.2d 1275, 1279 (5th Cir.1980):

A district court's decision on a motion to dismiss for want of prosecution requires weighing conflicting policies: on the one hand, the court's need to manage its docket, the public interest in expeditious resolution of litigation, and the risk of prejudice to defendants from delay; on the other hand, the policy favoring disposition of cases on their merits.

*Id.* (citing *Citizens Utilities Corp. v. AT & T*, 595 F.2d 1171, 1174 (9th Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 273, 62 L.Ed.2d 188 (1979)). Courts have devised standards under which this extreme sanction is appropriate. In *Rogers v. Kroger Co.*, 669 F.2d 317 (5th Cir.1982), the Court noted that dismissal under Rule 41(b) would be affirmed only upon a showing of a clear record of delay under circumstances where lesser sanctions would not serve the interests of justice. *Id.* at 320. The Court also noted that at least one of three "aggravating factors," *id.* at n. 3, is present where dismissal is upheld, *id.* at 320:

the extent to which the plaintiff, as distinguished from his counsel, was personally responsible for the delay, the degree of actual prejudice to the defendant, and whether delay was the result of intentional conduct.

*Id.* Moreover, delay must be unreasonable under all the circumstances of the case. *Link v. Wabash Railroad Company*, 370 U.S. 626, 634, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962); *Nealey*, 662 F.2d at 1280 ("unavoidable delay" cannot be basis for dismissal under Rule 41(b)). Because the record

in this case exposes a clear "lack of prosecutive intent on plaintiff's part," dismissal with prejudice is the appropriate sanction. *Locascio,* 694 F.2d at 499.

■ Defendants' July 7, 1983 memorandum in support of their motion for dismissal with prejudice sets forth in some detail the careless way in which this litigation was handled. The court's own examination of the docket sheet and the file largely confirms defendants' history, as in fact does plaintiff's responding memorandum of October 7, 1983. The court will summarize the factors supporting its decision to dismiss this case with prejudice under Rule 41(b).

On July 15, 1977, Hilda Mangel and Wendell Mew filed this action on behalf of a class of persons injured by a scheme of downward market manipulation by the Wilson defendants and other co-conspirators. On January 12, 1979, plaintiffs dismissed their claims against three defendants in an agreed order. At that point, the Wilson defendants and Loeb Rhoades & Co., Inc. were the sole defendants. Until the case was reassigned to this court on December 2, 1980, plaintiffs did virtually nothing to prosecute this case. All activity in the case up to that date was in response to defendants' motions, such as plaintiffs' objection to coordination and opposition to severance and transfer. (Plaintiffs did, however, serve a document production request on Loeb Rhoades. No discovery was directed to the Wilson defendants.)

On January 26, 1981, the court ordered plaintiffs to file an Amended Complaint and a motion for class certification. Plaintiffs have not explained why they waited until February 1981 to file a complaint dropping defendants who had been dismissed in January 1979. The court did not allow plaintiffs to add upward manipulation claims to the Amended Complaint, as these were within the ambit of other, already pending class actions. The plaintiffs made a decision, however, to continue their downward manipulation claims against the Wilson defendants. From the filing of the Amended Complaint in February 1981 to the Wilson defendants' August 1983 filing of the pending motions for summary judgment and for dismissal, plaintiffs did nothing to prosecute this case.

Two explanations for the inactivity in this case should be examined. First, plaintiffs contend that they could justifiably rely on discovery by the plaintiffs' committee in the cases consolidated under Civil Action 77 C 1206. Indeed, plaintiffs point to this reliance on other parties as a benefit to the Wilson defendants, as it prevented duplication of efforts by plaintiffs' counsel. Second, plaintiffs argue that they could rely on other pending class actions for vindication of their rights. Since some or all of plaintiffs' injuries could be redressed through claims of upward manipulation against Loeb Rhoades, plaintiffs should be allowed to wait and see if they would be included in any of those pending class actions. Both these justifications demonstrate that plaintiffs maintained their action against the Wilson defendants primarily as an insurance policy against failure of other parties to prevail in their motions for class certification.

Regarding discovery, plaintiffs agree that they did not personally depose witnesses, file interrogatories, or subpoena documents with the end of proving their claims against the Wilson defendants. An examination of the record reveals that this is the case, even though plaintiffs suggest at one point that they were able to get some information from Jack Bernhardt through their personal relationship with him and that other "informal discovery" efforts were made. It is noteworthy that plaintiffs missed Wilson's deposition, even though they were the only parties asserting claims against him. However, plaintiffs continue, they were justified in this failure. In a motion for a protective order, filed on April 22, 1983 with the design of preventing the deposition of Hilda Mangel, plaintiffs state:

As a matter of practicality and prudence and in order to avoid pursuing duplicative litigation which would likely be mooted by the certification of a class in

the *Healy* action, the plaintiff in *Mangel* has refrained from separate, active participation in discovery conducted under the aegis of the plaintiffs' committee in the consolidated litigation.

(Motion for Protective Order, filed 4/22/83, at ¶ 3.) This admission is supported by plaintiffs' statements in their depositions that they believed their claims somewhat duplicative of other actions in the consolidated case.

An examination of plaintiffs' own description of their claims, however, reveals that plaintiffs' claims differed dramatically from those of the other cases:

> There is simply no good reason for coordinating the *Mangel* case with the thirteen other "Loeb Rhoades" cases pending before this Court pursuant to the Manual for Complex Litigation, and there are compelling reasons for not doing so.... [T]he allegations which plaintiffs Mangel and Mew make against the publishing and investing defendants are completely distinct from those made against Loeb Rhoades in the thirteen other cases.

(Plaintiffs Opposition to Coordination, filed 6/2/78, p. 2.)

While the court agrees that reliance on coordinated discovery is justified to an extent, complete reliance is not. Plaintiffs' downward manipulation claims against the Wilson defendants are unique. There would be little reason for the other parties to conduct discovery on allegations so far removed from their own theories against persons not defendants in their actions. In fact, the testimony attached to plaintiffs' memorandum in opposition to the motion for summary judgment appears to have been gleaned from depositions having little to do with plaintiffs' claims. Wide gaps in plaintiffs' case that could have been filled through discovery additional to that of the plaintiffs' committee are left open. This is the unfortunate but predictable result of relying on discovery by parties whose claims are, by plaintiffs' admission, "completely distinct." It should also be noted

that it took plaintiffs a year to respond to the motion for summary judgment, in part because of the efforts in "compiling ... the necessary information." (Motion for Leave to File Instanter, filed 8/8/84, p. 1.) This supports an inference that plaintiffs were not even keeping track of the discovery being conducted for them by other parties.

The court, therefore, rejects plaintiffs' excuse that they could rely on others to find the evidence to support their claims. At the very least, plaintiffs should have deposed Wilson, a defendant in their case only. In addition to failing to conduct discovery, however, plaintiffs appear to have had no intention of proceeding against the Wilson defendants.

In the October 7, 1983 memorandum, plaintiffs reiterate that they in effect suspended prosecution of this action pending resolution of matters in class actions against Loeb Rhoades. This tactic was revealed in the April 26, 1983 motion for a protective order. In August 1983, after a class action had been certified in an upward manipulation case against Loeb Rhoades, Hilda Mangel attempted to dismiss this case with prejudice and without costs.[3] The motion was opposed by the Wilson defendants who sought fees and costs. The court denied Mangel's motion, and ordered briefing of the Wilson defendants' August 1983 motion for summary judgment, dismissal, costs, and fees.

The court rejects plaintiffs' argument that they could keep their claims against the Wilson defendants dormant while they determined if they were members of class actions against Loeb Rhoades (in which the Wilson defendants were not defendants). Since plaintiffs filed an action against the Wilson defendants, they were bound to prosecute it or dismiss it. It is simply wrong to hale a defendant to court as a hedge against losing a case against another person.

Plaintiffs point to defendants' lack of activity in the case. This is simply irrele-

---

**3.** [Footnote omitted for publication.]

vant to a failure to prosecute; plaintiffs, not defendants, filed this case:

> [P]laintiff cannot shift the responsibility of inaction to the defendant. There is no reason why the party being sued should take any steps to subject himself to the expense and inconvenience of a trial, if the plaintiff's neglect could reasonably give the defendant the hope or expectation that the case will never be tried.

5 J. Moore, *Moore's Federal Practice* ¶ 41.11[2], at 41–124 to 125 (1984). While delays occasioned by defendants cannot be held against plaintiffs, defendants caused no delays in this case. Plaintiffs have the duty to prosecute their case, and this simply was not done here.

Plaintiffs' failure to prosecute this case, coupled with an intention not to prosecute and the lack of other sanctions appropriate to correct plaintiffs' inactivity, persuade the court to dismiss this action with prejudice under Rule 41(b). This provides a second, independent reason to dismiss this action.

### Conclusion

Defendants' motions for summary judgment and for dismissal with prejudice for want of prosecution are granted in full. Defendants' motion for costs and fees, the only remaining motion in this action, will be decided pending receipt on February 15, 1985 of Mangel's memorandum concerning the proposed voluntary dismissal.

It is so ordered.

## ON MOTION FOR ATTORNEY FEES

This case is before the court on the motion of defendants Robert Wilson and Robert Wilson Associates ("the Wilson defendants") for their costs and attorney's fees in defending this action. On January 30, 1985, this court granted defendants' motion for summary judgment and for dismissal for want of prosecution. Plaintiff Hilda Mangel contends that an award of attorney's fees is not warranted in this case. For the reasons stated below, the Wilson defendants' motion for costs and attorney's fees is granted in part and denied in part.

▮ Regarding costs, Fed.R.Civ.P. 54(d) provides:

> Except where express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as a matter of course to the prevailing party unless the court otherwise directs....

Rule 54(d) creates a presumption in favor of awarding costs to the prevailing party which is not rebutted solely by an assertion that the nonprevailing party acted in good faith. *Gardner v. Southern Railway Systems*, 675 F.2d 949, 954 (7th Cir.1982). Instead, a court exercising its discretion to deny costs must provide specific reasons therefor. *Id.* No such reason exists in this case, and hence the court grants under Rule 54(d) the Wilson defendants' motion for costs against Mangel. This obviates ruling on whether costs may be recovered as a sanction. The Wilson defendants shall file their Bill of Costs by July 12, 1985. Mangel shall file her objections to this bill, if any, by August 2, 1985.

Attorney's fees are not generally recoverable by the prevailing party. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975) (discussing so-called "American Rule"). The Wilson defendants point to three bases for the imposition of fees in this case. First, they note that even under the American Rule, fees may be awarded to the prevailing party where "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons....'" *Alyeska*, 421 U.S. at 258–59, 95 S.Ct. at 1622 (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). Second, where the good faith requirement of Fed.R.Civ.P. 11 has been violated in the conduct of litigation, the Wilson defendants argue, fees may be imposed. Third, the Wilson defendants contend that Mangel is liable for excessive litigation costs under 28 U.S.C. § 1927. That section provides in full:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

■■■ All of these provisions incorporate a subjective bad faith element. For example, the Seventh Circuit has explained:

Section 1927 is punitive and thus must be construed strictly. A court may impose section 1927 fees only to sanction needless delay by counsel. The purpose of section 1927 is to penalize attorneys who engage in dilatory conduct. To be liable under § 1927, counsel must have engaged in "serious and studied disregard for the orderly process of justice." Where ... counsel's alleged misconduct was the filing and arguing of a claim, it is not sufficient that the claim be found meritless; the claim must be without a plausible legal or factual basis and lacking in justification.

*Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226–27 (7th Cir.1984). While an express finding of bad faith or intent to delay is not necessary under § 1927, "some degree of culpability on the part of counsel is required." *Id.* at 27.

■■■ Rule 11 also requires culpability of counsel. The version of Rule 11 predating the August 28, 1983 amendment (which became effective on August 1, 1983) governs, since most of the conduct complained of occurred before the amendment. The former Rule 11 provides, in relevant part, that

[t]he signature of an attorney [on a pleading] constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay.... For a willful violation of this rule an attorney may be subjected to appropriate disciplinary action....

The Wilson defendants argue first that this action was brought in bad faith and without a factual basis. Apart from the fact that the action was not filed by the present attorneys, against whom sanctions are sought, this argument must fail. The Second Circuit case of *Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir.1980), is instructive on the standard for determining if an action is commenced with such bad faith and an absence of factual basis that an award of fees under the judicial exception to the American Rule is appropriate. The Court found that such an action is one "'entirely without color *and* made for reasons of harassment or delay or for other improper purposes.'" *Id.* at 348 (emphasis added in *Nemeroff*) (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir.1977)). The Court explained further:

A claim is colorable, for the purpose of the bad faith exception, when it has some legal or factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that the facts supporting the claim *might be established,* not whether such facts actually *had been established.*

*Id.* (emphasis original).

In *Nemeroff,* the court found that the plaintiff had a colorable claim of market manipulation under the federal securities laws where there was evidence (1) of a correlation between the publishing defendants' publications of unfavorable reports about companies and the investor defendants' short sales of shares in those companies, (2) of a price decline in the shares during the complained of activity, and (3) of statements by investors and an official of the New York Stock Exchange that could be understood as opinions that the correlation was a result of an intentional "relationship" between the investor and publishing defendants. A similar factual background underlies the complaint in this action. At the time of filing the complaint, plaintiff had evidence (1) of a correlation between the author of an article critical of

the company in which she owned shares and short-selling by the Wilson defendants, (2) of heavy short-selling by the Wilson defendants during a period where there was an overall price decline in the shares, and (3) of a statement by one person that the correlation between the price decline and the short-selling was a product of intentional manipulation of the shares. Under the exception to the American Rule, 28 U.S.C. § 1927, or former Rule 11, these facts demonstrate a "colorable" claim. Moreover, there is no evidence that the claim was brought for harassment, delay, or other improper purposes.

█ The same cannot be said about the *conduct* of the litigation after the filing of the case. The court has already discussed the lack of prosecutorial intent on the part of plaintiff in its January 30, 1985 opinion dismissing plaintiff's complaint for want of prosecution. Critical points in the January 30, 1985 discussion include plaintiff's failure to conduct *any* discovery regarding her claims against the Wilson defendants (especially her failure to appear at the deposition of defendant Robert Wilson, of his alleged co-conspirator and one-time co-defendant Alan Abelson, or of R. Jack Bernhardt, the source of her information about a downward price manipulation scheme).

Plaintiff's response to the petition for fees and costs is one long admission that the action against the Wilson defendants was allowed to languish while she determined whether she was a member of a class action against an entirely separate defendant (Loeb Rhoades & Co., Inc.) in the consolidated case. Plaintiff also argues that the Wilson defendants did nothing to "extricate themselves from this litigation" (Mangel memorandum in response to motion for costs and fees, filed 10/7/83, p. 7), since they failed to conduct discovery and incurred fees and costs even though nothing was happening in the case. The failure of plaintiff or defendants to conduct any discovery, Mangel continues, indicates that she did not force any expenses on the Wilson defendants by virtue of filing a securities class action against them. Finally, she states that she or her attorneys should not be penalized for the Wilson defendants' failure earlier to move for summary judgment and dismissal.

The Wilson defendants counter by arguing that they were required to participate in discovery in the consolidated case because as defendants they were subject to substantial liability. Hence, for example, they were present at depositions of persons identified in answers to interrogatories propounded by other defendants as having knowledge of the allegations against the Wilson defendants. (*See* Exhibits to the Wilson defendants' motion for costs and fees, filed 7/7/83.)

The case of *Nemeroff v. Abelson,* 704 F.2d 652 (2d Cir.1983), the decision on appeal after remand in *Nemeroff v. Abelson,* 620 F.2d 339, is instructive of the standards to be applied to a claim that litigation, while not *commenced* in bad faith, was *conducted* in bad faith. There, the Court affirmed the district court's finding that the litigation was conducted in a dilatory manner for improper purposes, thus justifying an award of fees against the plaintiff. The Court found that the fees should be measured from the point at which plaintiff knew or should have known that the suit had no merit and could not be continued in good faith.

In this case, the court has already found, in the January 30, 1985 opinion granting the motion to dismiss for want of prosecution, that plaintiff conducted this litigation in a dilatory manner. However, determining when, if ever, the litigation began to be conducted in bad faith is more difficult. There is no point at which plaintiff discovered that her claims had no merit, as in the *Nemeroff* case. (For example, the SEC's investigation of the relevant trading makes no conclusion regarding legal violations by short-sellers, unlike the New York Stock Exchange's exoneration of the defendants in *Nemeroff.*) In fact, it is conceivable that the case did have merit, although plaintiff never conducted the discovery necessary to demonstrate that. However, continuing to conduct a meritless litigation is not the

only way bad faith necessary to justify an award of attorney's fees can be found. If the litigation is conducted for an "improper purpose," fee-shifting, at least under 28 U.S.C. § 1927, may be appropriate.

Here, as the court has already determined, the action against the Wilson defendants served as a "fallback" case in the event plaintiff was not included in a class action against another defendant. This is readily admitted by her as an explanation for her inactivity in the case. Additionally, it is clear that plaintiff could not have relied on the class action to vindicate in any way her claims against the Wilson defendants, since among the consolidated cases, her complaint was the only one alleging a downward manipulation scheme and claims against the Wilson defendants. Maintaining a claim against one defendant for such a reason is improper; it amounts to holding that defendant hostage while pursuing another defendant on different claims.

The point at which this improper purpose began was at the point where plaintiff articulated her intent to rely on the possible class action against Loeb Rhoades & Co., Inc. to vindicate her rights in all of her transactions in the shares of Olympia Brewing Company. In February 1981, plaintiff informed the court that should a class action against Loeb Rhoades & Co., Inc. be certified, she would likely dismiss her complaint. (Mangel memorandum, filed 10/7/83, at pp. 11–12.) Before that point, while plaintiff was dilatory in the conduct of her litigation, there is no evidence of bad faith or improper purpose. However, after February 1981, plaintiff's conduct supports an inference of improper purpose by her past and continuing failure to conduct discovery against the Wilson defendants (including failure to attend the deposition of Robert Wilson on January 27, 1983); the failure to supplement the record against the Wilson defendants so that the evidence of claims against them remained at the level of a thin, circumstantial case that could not withstand a motion for summary judgment; and her expressed intent to dismiss the complaint if plaintiff could be included in a class action against Loeb

Rhoades & Co., Inc. At the time that an improper purpose may be inferred, plaintiff's evidence against the Wilson defendants was insufficient to support her claims. Her decision to maintain those claims while waiting for resolution of matters in unrelated claims against an unrelated defendant constitutes a decision intentionally and improperly to multiply the proceedings in her case. Thus, fees incurred after that decision should be recovered by the Wilson defendants.

The court finds that plaintiff's conduct after February 1981, therefore, constituted conduct in violation of 28 U.S.C. § 1927. (A ruling under Rule 11 or the exception to the American Rule is therefore not necessary.) Section 1927 allows imposition of fees against the attorneys. The court finds such an award appropriate in this case, since the behavior of the attorneys in this action should be discouraged in the future. The attorneys who should be sanctioned include those who were in the case in February 1981 and who conducted the litigation through January 31, 1985. Any apportionment of fee liability for attorneys who did not actively participate in the case shall be determined in the briefing of the amount of fees to be awarded.

█ Plaintiff argues that the Wilson defendants unnecessarily incurred fees and should have moved earlier for summary judgment. To the extent these arguments have merit, they go not to whether fees should be shifted, but to the amount of fees that the Wilson defendants can recover. The court may award a "reasonable" attorney's fee for the excess costs incurred by plaintiff's improper conduct. If the Wilson defendants incurred excessive fees not necessary to a proper defense of this action, then, of course, those fees will not be allowed. However, in this case the Wilson defendants' inactivity in bringing to a conclusion a case brought against them cannot excuse plaintiff's failure to prosecute for an improper reason.

The Wilson defendants shall therefore file by July 12, 1985 an itemized fee peti-

tion for the fees that they incurred beginning in March 1981 through the resolution of this action on January 30, 1985. A response by plaintiff's attorneys is due by August 2, 1985. The Wilson defendants may reply by August 16, 1985.

In conclusion, the court finds that costs shall be taxed against plaintiff Hilda Mangel under Fed.R.Civ.P. 54(d). Attorney's fees reasonably incurred by the Wilson defendants from March 1981 through January 30, 1985 shall be taxed against plaintiff's attorneys under 28 U.S.C. § 1927. The appropriate supporting documents regarding the amount of taxable fees and costs shall be filed as described in this opinion.

It is so ordered.